# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARGARET MAZUR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CV17-826** |
| ) | |
| **SOUTHWESTERN VETERANS** ) | |
| **CENTER & DEPARTMENT OF** ) | |
| **MILITARY AND VETERANS** ) | |
| **AFFAIRS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION

Joy Flowers Conti, Chief United States District Judge

Pending before the court is the partial motion to dismiss the plaintiff's amended complaint filed by the defendants Southwestern Veterans Center ("SWVC") and Department of Military and Veterans Affairs ("DMVA"). (ECF No. 43).

## I.     Procedural Background

The plaintiff Margaret Mazur ("Ms. Mazur"), who is proceeding *pro se*, filed her original complaint on June 22, 2017. (ECF No. 1). On August 8, 2017, SWVC and DMVA filed an answer in response to the complaint. (ECF No. 11). Thereafter, Ms. Mazur filed a motion for leave to file an amended complaint to add "EEOC Retaliation Charge No. **846-2017-17047** to the current case." (ECF No. 24) (emphasis in original).  The No. 846-2017-17047 charge is Ms. Mazur's second EEOC charge relevant to this matter (the "Second/2017 EEOC Charge"). (ECF No. 36 at 6). Ms. Mazur's first EEOC charge relevant to this matter is No. 533-2016-01239 (the "First/2016 EEOC Charge"). (ECF No. 24-1 at 45).  On January 12, 2018, the court granted Ms.

Mazur's motion for leave to file an amended complaint, and on January 14, 2018, Ms. Mazur filed her amended complaint. (ECF No. 36). Ms. Mazur incorporated into her amended complaint, by reference, "all attachments from the original complaint [1], the motion to amend [24], and brief to motion to amended [25]." (ECF No. 36 at 1).

By their partial motion to dismiss, SWVC and DMVA seek to dismiss all of Ms. Mazur's claims of retaliation contained within her amended complaint; Ms. Mazur's retaliation claims are brought pursuant to Title VII, 42 U.S.C. § 2000a *et seq.*, and § 1981, 42 U.S.C. § 1981. (ECF No. 43, ¶ 7). SWVC and DMVA filed a brief in support of their partial motion to dismiss Ms. Mazur's amended complaint. (ECF No. 44). Ms. Mazur filed a response in opposition to the partial motion to dismiss. (ECF No. 45). SWVC and DMVA did not file a brief in reply to the response. SWVC's and DMVA's partial motion to dismiss is ripe for disposition.

## II.     The August 10, 2016 EEOC Notice of Charge of Discrimination

In support of their motion to dismiss, SWVC and DMVA rely upon, and attached to their motion to dismiss, an EEOC Notice of Charge of Discrimination dated August 10, 2016 (the "EEOC Notice of Charge of Discrimination"). As a general rule, a district court may not consider matters outside the complaint when ruling on a Rule 12(b)(6) motion to dismiss. "If, on a motion under Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). There is, however, an exception to this rule. For Rule 12(b)(6) purposes, courts may consider: (1) exhibits that are attached to the complaint; (2) matters of public record; and (3) any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the document is integral to or explicitly relied upon in the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Pension Ben. Guar.

Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) ("A court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

The EEOC Notice of Charge of Discrimination was addressed to Jennifer McClain-Miller ("Ms. McClain-Miller") of the "PA DEPT OF MILITARY AND VETERANS AFFAIRS HUMAN RESOURCES," and concerned EEOC Charge No. 533-2016-01239 (the First/2016 EEOC Charge). (ECF No. 43-1 at 2). It informed Ms. McClain-Miller that a Title VII charge of employment discrimination claim had been filed by Ms. Mazur against her organization and explained that the "circumstances of alleged discrimination" involved race and retaliation, the issues involved discharge, discipline, and harassment, and the date involved was on or about May 26, 2016. (Id.).

The EEOC Notice of Charge of Discrimination is a public record. See Miller v. Downtown Bid Services Corp., 281 F. Supp. 3d 15, 18 n. 5 (D.D.C. 2017); Thomas v. Lowe's Home Centers, Inc., Civ. No. 13-0779, 2014 WL 545862, at *2 (W.D. La. Feb. 10, 2014); Larkins v. Regional Elite Airline Services, LLC, Civ. No. 12-139, 2013 WL 1818528, at *3 n. 1 (S.D. Ohio Apr. 29, 2013) ("This Court has specifically held that '[d]ocuments filed with, and coming from, the EEOC are considered matters of public record'"); Davis v. Solid Waste Servs., Inc., Civ. Nos. 12-5628, 12-5629, 12-5630, 2013 WL 1234727, at *2 n. 2 (E.D. Pa. Mar. 5, 2013) (where neither party disputed the authenticity of the documents, court considered a number of EEOC documents, including the Notice of Charge of Discrimination). Accordingly, the court can review the EEOC Notice of Charge of Discrimination attached to SWVC's and DMVA's partial motion to dismiss Ms. Mazur's amended complaint without converting the motion into a motion for summary judgment.

**III.** **Factual Background Accepted as True for the Purpose of Resolving the Partial Motion to Dismiss[1]**

Ms. Mazur, who is Caucasian/white, was employed at SWVC as an Accounting Assistant. (ECF Nos. 24-1 at 42, 36 at 5). On May 16, 2016, Ms. Mazur went to the bank to withdraw approximately $4,700 for agency use. (ECF No. 1-7 at 1). Upon her return from the bank to the accounting office, which is a locked office with restrictive access requiring a key, Ms. Mazur placed the money on the chair of a co-worker, Sharon Warden ("Ms. Warden"), who is African American/black. (ECF No. 25-4 at 8). Ms. Warden was not in her office at the time. (Id.). Upon her return to her office, Ms. Warden had possession of the money for a short time period before she had Ms. Mazur come into the office so that they could count the money together, as per agency policy. (Id.). When they counted the money, $500 was missing. (Id.). Ms. Mazur did not take the money. (ECF No. 25-1 at 1).

The missing money was reported to their managers, including Ms. Mazur's direct supervisor, Darrell Lindsay ("Mr. Lindsay"), who is African American/black. (ECF No. 25-4 at 8). On May 18, 2016, SWVC and DMVA reported the theft to the police. (ECF No. 25-1 at 1). SWVC and DMVA conveyed their opinion to the police that Ms. Mazur had taken the money. (Id.). Ultimately, SWVC and DMVA decided not to press charges against Ms. Mazur because they did not have any evidence to support the charges, and the police ended its investigation. (Id.). On May 26, 2016, even though SWVC and DMVA had no evidence that Ms. Mazur took the money, Ms. Mazur was subjected to a pre-disciplinary conference ("PDC"). (ECF No. 1-6 at

---

[1] The factual background is derived from Ms. Mazur's amended complaint, the numerous documents which she incorporated by reference in her amended complaint, and the August 10, 2016 EEOC Notice of Charge of Discrimination attached by the defendants to their motion to dismiss and is limited to those facts which are relevant to SWVC's and DMVA's motion to dismiss Ms. Mazur's retaliation claims to the extent they are based upon her filing the First/2016 EEOC Charge on July 2, 2016.

4). At the conclusion of the PDC, SWVC and DMVA determined that Ms. Mazur had violated the DMVA's standards of conduct and work rules in three areas: (1) "Work Performance," "neglect of duty or responsibility, including, but not limited to, a failure to perform assigned tasks or a legitimate work assignment;" (2) "Use of Property," "Loss of or damage to Commonwealth property through carelessness, neglect or indifferences," "Stealing/Theft;" and (3) "Unauthorized Behavior," "Any action which would reflect unfavorably on or discredit the Commonwealth or [DMVA]." (Id. at 2).  As a result of these findings, Ms. Mazur was suspended without pay, and issued a final warning letter, which became part of Ms. Mazur's permanent record. (ECF No. 25-1 at 2).

Although Ms. Warden also was involved with the funds that went missing, unlike Ms. Mazur, Ms. Warden received only an oral reprimand. (ECF No. 36 at 9). Oral reprimands are not made part of the employee's record. (Id.).

Ms. Mazur returned to work on June 8, 2016, after the union that represented Ms. Mazur, SWVC, and DMVA reached an agreement concerning Ms. Mazur. (ECF No. 25-1 at 1). Ms. Mazur did not agree to the terms of the settlement and so informed the defendants upon her return to work. (ECF No. 1-17 at 1-2).  Once Ms. Mazur returned to work she tried repeatedly and unsuccessfully to convince the defendants that she had not taken the funds and that her personnel record should be expunged. (ECF No. 25-1 at 2).

In response to Ms. Mazur's attempts to convince SWVC and DMVA that she did not take the missing funds and to have her personnel record expunged of any reference to the missing funds, employees of SWVC and DMVA, including Mr. Lindsay, Ms. Cuthbert, Ms. Kreiser, Ms. McClain-Miller, Mr. Lowen, and Mr. Adams, engaged in conduct toward Ms. Mazur which she considered to be harassing and discriminatory. (ECF No. 24-1 at 45). Ms. Cuthbert, Ms. Kreiser,

and Ms. McClain-Miller are human resources employees of SWVC and DMVA. (Id.). Mr. Lowen is the Assistant Commandant and Mr. Adams is the Commandant at SWVC and DMVA. (Id.).

The defendants have a zero tolerance policy against harassment and discrimination that states that if an employee is subjected to harassment or discrimination, the employee is to contact any official within the chain of command so that the harassment and discrimination can be stopped and an investigation initiated. (ECF No. 36 at 3). Ms. Mazur followed the policy, reported the conduct she considered to be disparate treatment and race discrimination by her supervisor, Mr. Lindsay, and others, through her entire chain of command, up to and including Andrew Ruscavage ("Mr. Ruscavage"), Director of all six veterans' homes for SWVC and DMVA, and requested relief. (Id. at 2-3). Ms. Mazur expected Mr. Ruscavage to order the misconduct to cease. (Id. at 3). Instead, Mr. Ruscavage directed and gave permission to the responsible management officials and human resources personnel who had been engaging in said misconduct to "push back" if Ms. Mazur was going to continue to push to clear her name of wrongdoing. (Id. at 2-3).

Upon receiving Mr. Ruscavage's permission and direction to "push back" against Ms. Mazur, a) the defendants' human resources personnel solicited complaints about Ms. Mazur from Mr. Lindsay, Ms. Cuthbert, and Ms. Kreiser; b) Ms. McClain-Miller requested that Mr. Lindsay notify them if Ms. Mazur became disruptive in the workplace or if she conducted private business during working hours; c) Ms. Mazur's work files were interfered with (necessary files were deleted); and d) Ms. Mazur was restricted from accessing needed files to perform properly her assigned tasks. (ECF Nos. 25-1 at 2, 36 at 2).

Mr. Lindsay began regularly to berate Ms. Mazur in front of others. (ECF No. 36 at 3). Mr. Lindsay became even more aggressive to Ms. Mazur in the workplace after he was arrested in September 2016 for a violent firearms charge in which he was shot and he shot others. (Id.). At that time, Mr. Lindsay bragged to his employees of being from the hood and taking the law into his own hands. (Id.).

Mr. Lindsay displayed an extremely short temper and would yell at Ms. Mazur over minor work issues before getting the facts. (Id.). Mr. Lindsay would frequently come into Ms. Mazur's office, close the door and yell at her. (Id.). Mr. Lindsay never offered Ms. Mazur the ability to have union representation during these hostile, closed door sessions. (Id.).

On July 2, 2016, Ms. Mazur filed the First/2016 EEOC Charge against SWVC and DMVA with the EEOC. (ECF No. 36 at 6). Thereafter, every work task Ms. Mazur performed was scrutinized, whereas prior to her filing the First/2016 EEOC Charge, her work was done without supervision and praised. (Id. at 3-4). Ms. Mazur often became sick at work as a result of the excessive harassment, monitoring, and solicitation of wrongdoing by the human resources personnel. (Id. at 4). Ms. Mazur was required to obtain a doctor's note for any absence while she was not on a leave restriction notice; other employees did not have to obtain a doctor's note for absences unless they were abusing sick leave. (Id.). Mr. Lindsay told Ms. Mazur that human resources personnel repeatedly asked him for any mistakes she made so that they could take action against her. (Id.).

Attached to Ms. Mazur's motion for leave to file an amended complaint, and therefore incorporated into her amended complaint by reference, is an "Attachment to EEOC Retaliation Complaint Showing Ongoing Harassment, Discrimination and Creation of a Hostile Working Environment Margaret Mazur EEOC case No. 533-2016-01239," drafted by Ms. Mazur (the

"EEOC Attachment"). (ECF No. 24-1 at 45-50). In the EEOC Attachment, Ms. Mazur listed events that occurred between June 2, 2016 and April 19, 2017, that she considered to be instances of harassment and retaliation for filing the First/2016 EEOC Charge against SWVC and DMVA. (Id.). Also attached to Ms. Mazur's brief in support of her motion for leave to file an amended complaint, and therefore incorporated into her amended complaint by reference, is a document dated August 23, 2017, that Ms. Mazur submitted as part of an "UC Appeal Hearing" (the "UC Appeal Hearing Memorandum"). (ECF No. 25-1). In the UC Appeal Hearing Memorandum, Ms. Mazur listed information on "Agency Retaliation/Discrimination and Exhaustion of Alternatives." (Id.).

In either the EEOC Attachment (ECF No. 24-1) or the UC Appeal Hearing Memorandum (ECF No. 25-1), Ms. Mazur listed the following conduct which she considered to be evidence of the defendants' harassment or retaliation.

- From June 2, 2016 to June 8, 2016, actions were being taken among SWVC, DMVA, and the union that represented Ms. Mazur concerning her being returned to work about which she was unaware. (ECF No. 25-1 at 3).

- On June 13, 2016, when Ms. Mazur returned to work from her suspension, she was unable to sign on to her computer to do her work. Once she was able to sign in, her emails were jumbled and the format was missing. The IT department was able to organize her emails and restore the folders for the emails. Ms. Mazur had to get a new badge and apply for a new credit card because both had been destroyed while she was suspended; per agency policy, badges were only destroyed if an employee was terminated. (Id. at 4).

- On June 14, 2016, Ms. Kreiser stated in an email that Ms. Mazur should have been terminated. (Id.).

- On June 14, 2016, Ms. McClain-Miller sent an email to Ms. Mazur reminding her that she was to cease contacting DMVA employees; Ms. Mazur had been attempting to obtain the names of everyone involved with her May 2016 PDC. In her suspension letter, Ms. Mazur was told to contact human resources if she had any questions. When she did so, Ms. McClain-Miller and Ms. Cuthbert became angry at her and Ms. McClain-Miller threatened Ms. Mazur through emails and phone calls. (Id.).

- On June 14, 2016, Ms. Mazur emailed Mr. Ruscavage asking if he had received her fax from the day before; the fax contained two photos of Ms. Mazur's office which showed that from her desk, Ms. Mazur could see Ms. Warden's chair where she had left the money. (Id. at 5). On June 15, 2016, Ms. McClain-Miller called Ms. Mazur and told her to cease and desist contacting people because "the matter was closed." (Id.).

- On June 15, 2016, all but one of Ms. Mazur's folders with her emails were deleted from her computer. (Id.).

- On June 21, 2016, Mr. Lowen sent an email to Ms. McClain-Miller stating that he did not believe that Ms. Mazur had been sick on June 16, 2016, even though she was not on any leave restriction, she did not have a history of lying, and Mr. Lowen was not a doctor. Agency policy was that if an employee was suspected of abusing sick leave, they were placed on notice by being given a letter that stated that a doctor's note was required when sick leave was used. Mr. Lindsay told Ms. Mazur she needed to obtain

a doctor's note for the missed day; in order to get the note, she missed a second day of work. (Id.)

- On July 13, 2016, Ms. Kreiser sent an email soliciting any information on Ms. Mazur being disruptive in the workplace. (Id. at 5-6).

- On July 14, 2016, Mr. Lindsay told Ms. Mazur that if she kept fighting to clear her name she was going to lose everything, including her job. (Id. at 6). Mr. Lindsay told Ms. Mazur that the agency was trying to catch her performing personal business on company time so she could be fired on the spot. (Id.).

- On July 17, 2016, Ms. Mazur was reprimanded by Mr. Lindsay for asking Gerard Hrapla ("Mr. Hrapla"), the defendants' security supervisor, to look at security film from when the office had had a fire drill that morning. (Id.). Ms. Mazur had left her purse in her office during the drill and when she returned to the accounting office, Mr. Lowen was bent down in front of accounting office like he was tying his shoe, her office door, located inside the accounting office, was open even though her recollection was that she had shut it, and her desk drawer appeared to be partially open. (ECF Nos. 24-1 at 47, 25-1 at 6).

- On July 18, 2016, Mr. Lindsay came into Ms. Mazur's office, shut the door, and yelled at her for getting Mr. Hrapla in trouble with Mr. Lowen. (ECF No. 25-1 at 6). Mr. Lindsay told her that she was getting people in trouble through her actions and that she could be PDC'd for not following the chain of command. (Id.). Apparently Mr. Hrapla had looked at the security film without telling Mr. Lowen. (Id.). Ms. Mazur had followed agency protocol and followed the chain of command so there was no reason Mr. Hrapla should have been in trouble. (Id.).

- On July 21, 2016, Mr. Lindsay shut Ms. Mazur's office door three times during the work day and yelled at her for getting others in trouble with Mr. Lowen; Ms. Mazur had asked questions of her co-workers to help clear her name relative to the missing funds she had been accused of taking/losing. (Id. at 6-7).

- On July 26, 2016, Ms. Cuthbert sent Mr. Adams an email asking him if she could attend Ms. Mazur's unemployment compensation appeal hearing even though she had not been working on the day the $500 went missing; Ms. Mazur had sought unemployment compensation benefits while she was suspended from work due to her involvement with the missing money. (Id. at 7). Ms. Cuthbert made seven false allegations at Ms. Mazur's initial benefits hearing. (Id.). Mr. Adams told Ms. Cuthbert not to attend the hearing. (Id.).

- On August 2, 2016, Ms. Kreiser relayed to Mr. Ruscavage that Ms. Mazur had agreed to a pre-grievance settlement ("PGS") even though Ms. Kreiser had no idea what Ms. Mazur had and had not agreed to since Ms. Kreiser had not been at the settlement meeting. (Id.). Ms. Kreiser stated that she believed Ms. Mazur had agreed to the settlement to come back to work because Ms. Mazur thought she was going to be terminated. (Id.). Ms. Kreiser was aware that Ms. Mazur was trying to get her discipline removed from her employment record and said that was not going to happen. (Id.). In fact, Ms. Mazur never filed or authorized a grievance, did not sign a grievance, and thus, since there was no grievance, there could not have been a pre-grievance settlement and the whole grievance scenario was invented by Ms. Cuthbert, Ms. Kreiser, and Ms. McClain- Miller. (Id.).

- On August 3, 2016, Mr. Lindsay was loudly chastising Lisa Havrilla ("Ms. Havrilla") for problems Ms. Havrilla was having with Matrix. (Id.). Ms. Havrilla was one of Ms. Mazur's co-workers. (Id.). Ms. Mazur interjected herself into the conversation to inform Mr. Lindsay that she too had had problems with Matrix. (Id.). Mr. Lindsay angrily told Ms. Mazur he was talking to Ms. Havrilla, and when Ms. Mazur told him she was just sharing her experience with Matrix so he would know there was a glitch with Matrix, Mr. Lindsay told her to get her purse and belongings and go. (Id.). Ms. Mazur did not leave the office; instead she sent Mr. Lindsay an email telling him why she had said what she said, including "[y]ou joke around a lot and I don't think it's fair to tell someone to leave just because you don't like something." (Id.). Upon reading the email, Mr. Lindsay blew up in anger, told Ms. Mazur that he had had enough and was going to talk to Mr. Lowen. (Id.). Mr. Lindsay left the office for about five minutes and when he returned, he told Ms. Mazur and Ms. Havrilla that there would be no more joking in the office. (Id.).  Later on August 3, 2016, when Mr. Lindsay was calmer, Ms. Mazur asked him what was all the anger about and asked him if he was trying to get her fired. (ECF No. 24-1 at 48).  Mr. Lindsay responded that he would not be trying to fire Ms. Mazur, "[a]ll that would be coming from the GAP's efforts, not his." (Id.).

- On August 4, 2016, Mr. Lindsay chastised Ms. Mazur for taking Ms. Havrilla to the bank on a day he was not working. (ECF No. 25-1 at 7). Ms. Mazur had written out a replenishment check to Ms. Havrilla since they were taking turns replenishing and Ms. Havrilla had asked Ms. Mazur to go to the bank with her. (Id.). Although there had never been any prior communication that she was not to take Ms. Havrilla to the

bank or that they were not to rotate the replenishment job, and Ms. Mazur had asked Mr. Lowen on an earlier date if it was okay that she and Ms. Havrilla went to the bank together on a day when Mr. Lindsay was off, and had been given permission to do so, Mr. Lindsay told Ms. Mazur that if she took Ms. Havrilla to the bank again, he would PDC her. (Id.).

- On November 3, 2016, Ms. McClain-Miller wrote a witness statement about her version of the events from June 1-13, 2016, which contained false information. (Id. at 7-8).

- On February 2, 2017, after being arraigned for a criminal violation, Mr. Lindsay became more aggressive in his harassment of Ms. Mazur. (Id. at 8). His harassment, hostility and extreme micromanagement of Ms. Mazur was such that she could not get her job done and caused her to vomit more than once in the bathroom at work. (Id.)

- On February 9, 2017, paperwork that Ms. Mazur had prepared went missing from her desk. (Id.).

- On February 10, 2017, Ms. Mazur had approximately thirty invoices that needed to be verified before they could be paid. (Id. at 9). The vendor logs were unavailable for the time frame of the invoices, and Ms. Mazur asked Mr. Lindsay what she should do to get them verified. (Id.). He told her to contact April Sams ("Ms. Sams") to have her verify the invoices. (Id.). Ms. Mazur followed Mr. Lindsay's directions, contacted Ms. Sams, and when she did not hear back from Ms. Sams, again asked Mr. Lindsay for guidance. (Id.). Mr. Lindsay reprimanded Ms. Mazur for doing exactly what he had told her to do. (Id.).

- On February 17, 2017, Ms. Mazur was copied on an email concerning an issue that needed to be resolved. (Id.). The person who was the main recipient of the email was not in the office on that day and since Ms. Mazur knew the answer to the query, she responded to the email. (Id.). When Mr. Lindsay found out that Ms. Mazur had answered an email that she had only been copied on, he told Ms. Mazur that she could be PDC'd for responding to an email upon which she was only copied. (Id.). He also told Ms. Mazur that she had better hope that Mr. Lowen did not find out. (Id.).

- On February 17, 2017, Mr. Lindsay encouraged Ms. Mazur to go on a bank run with an agency vehicle and then use the vehicle to go to a doctor's appointment. (Id.). Ms. Mazur felt that Mr. Lindsay was trying to set her up to be fired for using an agency vehicle for a private errand). (Id.). She did not use the agency vehicle to go to her doctor's appointment. (Id.).

- On March 9, 2017, Mr. Lowen came into the accounting office where Ms. Mazur was working, with signed checks for her co-worker, Lisa. (Id.). He put the checks on Lisa's chair, looked at Ms. Mazur, and told her what he was putting on Lisa's chair. (Id.).

- On March 14, 2017, Mr. Lindsay stood in Ms. Mazur's office door way and sang "You're no good, you're no good, you're no good." (Id.).

- On March 14, 2017, Mr. Lindsay came into Ms. Mazur's office while she was on a break to tell her guest, a retired SWVC employee, to leave the premises because Mr. Lowen did not want the guest on the grounds. (Id.).

- On March 15, 2017, instead of speaking to Ms. Mazur directly, Mr. Lowen sent Ms. Mazur an email about a credit card charge that he rejected because there was a

problem with it. (<u>Id.</u>). By the time it was rejected, changes could not be made to the
transaction. (<u>Id.</u>). It made unnecessary extra work for Ms. Mazur. (<u>Id.</u>).

- On March 16, 2017, Mr. Lindsay came into Ms. Mazur's office concerning five
  things about which he was upset with her. (<u>Id.</u>). He wanted to make her look
  incompetent. (ECF No. 24-1 at 50). Only one of the five items was a legitimate
  complaint. (<u>Id.</u>).  Half of Ms. Mazur's day was spent addressing one of the complaints
  because Mr. Lindsay kept interrupting Ms. Mazur's work to demand that she do
  OSTs a certain way because that was how Mr. Lowen wanted them done and she kept
  having to explain to him how it was not possible to do what Mr. Lowen wanted.
  (<u>Id.</u>).

- On April 12, 2017, Mr. Lindsay blew up at Ms. Mazur during their weekly meeting.
  While she was telling him about issues she had, Mr. Lindsay kept getting the two
  vendors confused. (ECF No. 25-1 at 9-10). Ms. Mazur told him three times that he
  was getting them confused. (<u>Id.</u> at 10). Mr. Lindsay went to his computer and asked
  about certain vendor purchase orders. (<u>Id.</u>). Ms. Mazur again explained that they were
  not the correct purchase orders involved, at which time Mr. Lindsay yelled at Ms.
  Mazur to stop and that he was serious. (<u>Id.</u>). Ms. Mazur was being serious, Mr.
  Lindsay just could not understand the issue she was sharing, and refused to hear her
  out or allow her to explain in such a way that he could understand. (<u>Id.</u>).

- On April 19, 2017, Mr. Lindsay told Ms. Mazur he needed to have meetings on open
  commitments every week. (<u>Id.</u>). She told him that she had been on top of it, at which
  time Mr. Lindsay began raising his voice, and said that he was getting tired of her
  attitude, that she had had an attitude for two days. (<u>Id.</u>).  Mr. Lindsay told Ms. Mazur

to calm down, she told him she was calm, and that all she said was she was on top of it. (Id.).

Ultimately, Ms. Mazur resigned from her position on April 26, 2017. (ECF No. 24-1 at 4). Up until the time she quit, Ms. Mazur repeatedly tried to get Mr. Lindsay to stop his intimidating practice of micro-managing and yelling at her. (ECF No. 25-1 at 10). He would frequently come into her office, get up into her personal space, and yell at her. He also would make her show him how to do certain transactions even though she had repeatedly done so before. (Id.).

Ms. Mazur complained to Mr. Adams about Mr. Lindsay's harassment on two occasions, three weeks and one week before she quit, but he did nothing. (Id.).

It was a combined effort on the part of Mr. Lindsay and SWVC's and DMVA's human resources personnel to fire Ms. Mazur a second time. (Id.).

As a result of Mr. Ruscavage's "green light" to harass Ms. Mazur, Ms. Mazur was frequently threatened with PDCs for the most minor instances and harassed on an almost daily basis by "all witnesses in this army that has shown up against me today (at the August 23, 2017 UC Appeal Hearing No. 19-09-C-B696)," as well Mr. Lowen. (Id. at 1, 10).

Mr. Lindsay had not treated Ms. Mazur in such a condescending manner prior to her filing the First/2016 EEOC Charge. (ECF No. 24-1 at 50). Mr. Lindsay was encouraged by Mr. Lowen, Ms. Cuthbert, Ms. Kreiser, and Ms. McClain-Miller to mistreat Ms. Mazur in order to goad her into being disrespectful so that she could be fired. (Id.). These individuals were using Mr. Lindsay to try to get Ms. Mazur to quit or to trump up a reason to fire her. (Id.). Ms. Mazur was subjected to such mistreatment on an almost daily basis, the specific instances listed in the EEOC Attachment were just some of the instances. (Id.).

Subsequent to resigning on April 26, 2017, Ms. Mazur filed a second EEOC charge of discrimination against SWVC/DMVA, EEOC Charge No. 846-2017-17047 (the Second/2017 EEOC Charge). (Id. at 4).  In the Second/2017 EEOC Charge, Ms. Mazur explained that in July 2016, she filed a charge of discrimination with the EEOC and since that time she had been subjected to increased scrutiny and treated less favorably by her supervisor and other management employees, and that this treatment was in retaliation for her filing the first EEOC charge. (Id.). The charge listed the dates the retaliation took place as, at the earliest June 2, 2016, and at the latest April 19, 2017, and continuing. (Id.).

IV.     **Standard of Review**

A.  **Motion to dismiss pursuant to Rule 12(b)(6)**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). Notably,

> [t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully....Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief'."

Id. (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

The Court of Appeals for the Third Circuit has instructed that "a court reviewing the sufficiency of a complaint must take three steps." Connelly v. Lane Const. Corp., 809 F.3d 780, 876-77 (3d Cir. 2016). The court of appeals explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. *See also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."(citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

Id. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)). A plaintiff must set forth "sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence" of the elements of the claim for relief. Connelly, 809 F.3d at 789; Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017).

## B. *Pro se p*leadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-21 (1972). If

the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364, 365 (1982); United States ex rel. Montgomery v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with measure of tolerance"); Freeman v. Department of Corrections, 949 F.2d 360, 361 n. 1 (10th Cir. 1991) (quotation omitted). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997), overruled on other grounds, Abdul-Akbar v. McKelvie, 239 F.3d 307, 311 (3d Cir. 2001); see, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990) (same). Because Ms. Mazur is a *pro se* litigant, this court will carefully read the pleadings and construe all factual allegations in her favor. There are, however, limits to the court's procedural flexibility; "*pro se* litigants still must allege sufficient facts in their complaints to support a claim ... they cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (citations omitted); see Fantone v. Latini, 780 F.3d 184, 193 (3d Cir. 2015) (recognizing that a *pro se* complaint must also satisfy *Iqbal*'s pleading standard); Kemerer v. Hilliard, Civ. No. 18-374, 2018 WL 3448153, at *1 (W.D. Pa. July 17, 2018) ("Although *pro se* plaintiffs are not held to the same standard as lawyers when the Court analyzes formal pleadings, any pleading must still contain sufficient factual allegations that, when accepted as true, 'state a claim to relief that is plausible on its face'") (quoting Iqbal, 556 U.S. at 678).

V.    **Analysis**

**A.  The scope of Ms. Mazur's Title VII and § 1981 retaliation claims**

By way of their partial motion to dismiss, SWVC and DMVA assert that they seek to dismiss all of Ms. Mazur's claims of retaliation contained within her amended complaint. The difficulty with this request is that SWVC and DMVA, through their motion and supporting brief, contend that Ms. Mazur's claims of retaliation in violation of Title VII and § 1981 are based upon Ms. Mazur filing the First/2016 EEOC Charge, but this summary of Ms. Mazur's retaliation claims is an overly restrictive reading of the retaliation claims set forth in Ms. Mazur's amended complaint. The defendants are correct that Ms. Mazur's amended complaint alleges that SWVC and DMVA retaliated against her, in violation of Title VII and § 1981, for filing the First/2016 EEOC Charge.  Ms. Mazur's amended complaint, however, also alleges that SWVC and DMVA retaliated against Ms. Mazur, in violation of Title VII and § 1981, for her complaints of disparate treatment and racial discrimination and her requesting relief from this disparate treatment and racial discrimination, up the chain of SWVC's and DMVA's command, including to Mr. Ruscavage, beginning on June 15, 2016. <u>See</u> ECF No. 36 at 3. SWVC and DMVA did not move to dismiss these claims of retaliation by Ms. Mazur.

In <u>Moore v. City of Philadelphia</u>, 461 F.3d 331 (3d Cir. 2006), as amended (Sept. 13, 2006), the appellate court explained, "[w]ith respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."  <u>Moore</u>, 461 F.3d at 341. "'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to management'. To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, 'we

look to the message being conveyed rather than the means of conveyance'." Id. at 343 (quoting Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)); Dykes v. Marco Group, Inc., 222 F. Supp. 3d 418, 431 (E.D. Pa. 2016) (denying motion for summary judgment with respect to plaintiff's claims that defendant violated Title VII, § 1981, and the PHRA by retaliating against him for complaining that he was being discriminated against based upon his race); Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 754 (2016) (explaining that protected activity for purposes of a § 1981 retaliation claim includes not only formal charges but also informal complaints of discriminatory employment practices). "Complaints [of discriminatory employment practices] must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice." Caplan, 210 F. Supp. 3d at 754 (citing Sanchez v. SunGard Availability Services LP, 362 F. App'x 283, 288 (3d Cir. 2010); see Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) (concluding complaints by plaintiff to defendant, whether oral or written, formal or informal, are sufficient to satisfy the first prong of a retaliation claim, provided the complaints expressed plaintiff's opposition to a protected activity under Title VII).

Ms. Mazur's alleged complaints of disparate treatment and racial discrimination and her requesting relief from this disparate treatment and racial discrimination, up the chain of command, including to Mr. Ruscavage, constitute protected activities under Title VII and § 1981. (See ECF No. 36 at 3). Accordingly, because SWVC and DMVA did not move to dismiss this component of Ms. Mazur's Title VII and § 1981 retaliation claims, to the extent that Ms. Mazur's Title VII and § 1981 retaliation claims are based upon Ms. Mazur being retaliated against for complaining about disparate treatment and racial discrimination and requesting relief

from this disparate treatment and racial discrimination in June 2016, these retaliation claims remain a part of Ms. Mazur's case against SWVC and DMVA.

**B. SWVC's and DMVA's motion to dismiss Ms. Mazur's Title VII retaliation claim based upon her filing the First/2016 EEOC Charge**

Turning to Ms. Mazur's Title VII retaliation claim based upon her filing the First/2016 EEOC Charge, in order to allege a *prima facie* case of retaliation under Title VII, Ms. Mazur must allege facts to support that: (1) she engaged in activity protected by Title VII; (2) SWVC and DMVA took an adverse employment action against her; and (3) there was a causal link between her participation in the protected activity and SWVC's and DMVA's adverse employment action. Moore, 461 F.3d at 340.

**1. Protected activity**

With respect to the first prong of a *prima facie* case of retaliation under Title VII, that the plaintiff had engaged in protected activity, SWVC and DMVA do not dispute that Ms. Mazur's action of filing the First/2016 EEOC Charge is a protected activity.

**2. Adverse employment action**

With respect to the second prong of a *prima facie* retaliation claim, that the employer took an adverse employment action against the plaintiff, "[f]ollowing the Supreme Court's decision in Burlington Northern [& Sante Fe Ry. v. White, 548 U.S. 53, 68 (2006)], a retaliation claim lies where any activity of the employer—including harassment sufficient to create a hostile work environment—'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'." Boykins v. SEPTA, Civ. No. 17-1980, 2018 WL 460652, at *8 (3d Cir. Jan. 17, 2018) (citations omitted). In other words, "[u]nlike other provisions, the second prong of the *prima facie* retaliation case reaches more broadly to include not just 'ultimate

employment decision[s],' but also material adverse actions which are 'one[s] that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'." Remp v. Alcon Labs, Inc., Civ. No. 13-6407, 2016 WL 1161616, at *7 (E.D. Pa. Mar. 24, 2016) (citations omitted). "In evaluating whether actions are materially adverse, we must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience'." Moore, 461 F.3d at 342 (citing Burlington Northern, 548 U.S. at 68).

SWVC and DMVA contend that the majority of the alleged misconducts undertaken toward Ms. Mazur do not constitute adverse employment actions and Ms. Mazur did not otherwise allege facts to support that she suffered an adverse employment action by SWVC and DMVA. Ms. Mazur asserts that she was constructively discharged from her employment with the defendants on April 27, 2016, and otherwise subjected to materially adverse employment actions by the defendants.

Certainly a constructive discharge is an adverse employment action. Mieczkowski v. York City Sch. Dist., 414 F. App'x 441, 445 (3d Cir. 2011); Hill v. Borough of Kutztown, 455 F.3d 225, 247 n. 32 (3d Cir. 2006). Courts consider a number of factors in assessing whether an employee was constructively discharged, "including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." Mandell v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013) (citing Colwell v. Rite Aid Corp., 602 F.3d 495, 503 (3d Cir. 2010)). In Tunis v. City of Newark, 184 F. App'x 140 (3d Cir. 2006), the Third Circuit Court of Appeals explained,

"[w]hile the law [of constructive discharge] protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline." Tunis, 184 F. App'x at 143.

Taking into consideration all the factual allegations contained in Ms. Mazur's amended complaint as well as the documents incorporated by reference in her amended complaint, Ms. Mazur alleges numerous actions were undertaken by employees of SWVC and DMVA against her in retaliation for her filing the First/2016 EEOC Charge and that ultimately this pattern of harassment resulted in her being constructively discharged on April 27, 2016, when she resigned from her position with the defendants. Some of the alleged misconduct is very specific. Beginning on June 21, 2016, Mr. Lowen required Ms. Mazur to submit a doctor's note any time she was absent from work due to an illness. (ECF No. 25-1 at 5). On February 17, 2017, Mr. Lindsay encouraged Ms. Mazur on one occasion to use an agency vehicle to go on a bank run and then take it to see a doctor for a cough she had had for a week, which Ms. Mazur opined was Mr. Lindsay trying to set her up to be fired, since agency vehicles were only to be used for agency business and not personal business. (Id. at 9).  On March 14, 2017, Mr. Lindsay sang "you're no good, you're no good, you're no good" to Ms. Mazur in her office. (ECF No. 36 at 4). On March 14, 2017, Mr. Lindsay made a guest of Ms. Mazur who was visiting her during her lunch break leave the premises because Mr. Lowen did not want the guest on the premises. (ECF No. 25-1 at 9). On March 15, 2017, Mr. Lowen failed to communicate in a timely manner with Ms. Mazur over a credit card matter such that a mistake could not be corrected in time. (Id.).

Other alleged misconduct is more general. Ms. Mazur was excessively supervised on a daily basis. (ECF No. 36 at 3). Mr. Lindsay regularly berated Ms. Mazur in front of others

without justification. (ECF Nos. 24-1 at 45, 36 at 3). Mr. Lindsay frequently yelled at Ms. Mazur for minor work issues and unfairly reprimanded her. (ECF No. 36 at 3). SWVC and DMVA human resources personnel repeatedly told Mr. Lindsay to tell them if Ms. Mazur made any mistakes. (Id. at 4). Mr. Lowen, Ms. Cuthbert, Ms. Kreiser, and Ms. McClain-Miller encouraged Mr. Lindsay to mistreat Ms. Mazur to goad her into being disrespectful so that she could be fired or otherwise would quit. (ECF No. 24-1 at 50). Mr. Lindsay tried to make Ms. Mazur look incompetent and waste her time. (Id.). Mr. Lindsay made constant threats to subject Ms. Mazur to a PDC for even the most trivial matters, which basically was a threat to have Ms. Mazur fired since, as a result of the Final Warning Letter already in her file, she then could be fired for any reason. (ECF No. 25-1 at 10).  Mr. Lindsay lost his temper with Ms. Mazur on a regular basis, talked down to Ms. Mazur and her co-worker if anything was incorrect in their work, and quickly got impatient with Ms. Mazur. (Id.). Ms. Cuthbert, Ms. Kreiser, Ms. McClain-Miller, Mr. Lowen, and Mr. Adams engaged in conduct toward Ms. Mazur that she considered to be discriminatory and harassing. (ECF No. 24-1 at 45).

While the majority of these allegations are the type of trivial harms that do not constitute a material adverse action, i.e., an action that well might have dissuaded a reasonable worker from making a complaint or charge of discrimination, Mr. Lindsay's alleged conduct of regularly berating Ms. Mazur in front of others, unfairly reprimanding Ms. Mazur, and constantly threatening to subject Ms. Mazur to a PDC, which was a threat to have Ms. Mazur fired, is conduct that could be serious enough to dissuade a reasonable person from engaging in protected activity and, therefore, constitute a material adverse action.  See El v. Advance Stores Company, Inc., Civ. No. 17-2345, 2017 WL 6606887, at *10 (E.D. Pa. Dec. 27, 2017) (court concluded district manager retaliated against plaintiff when he threatened to write her up and berated her

after he discovered she had reported his conduct toward her to his supervisor); Skoorka v. Kean

Univ., Civ. No. 09-3428, 2015 WL 3533878, at *21 (D.N.J. June 2, 2015) (court denied motion

for summary judgment as to Title VII retaliation claim where chairman of plaintiff's department

regularly interrupted plaintiff while he was teaching class and yelled at him in front of his

students).

### 3. Causation element

With respect to the third element of a *prima facie* Title VII retaliation case, the causation

element, "the mere fact that [an] adverse employment action occurs after a complaint [has been

filed] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link

between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1303 (3d Cir. 1997). In

Daniels v. School Dist. of Phila., 776 F.3d 181 (3d Cir. 2015), the appellate court explained how

the requisite causal connection is established in a retaliation case:

> To demonstrate a link between protected activity and an employer's adverse action,
> a plaintiff may rely on the temporal proximity between the two if "unusually
> suggestive." *Id.*; *Marra*, 497 F.3d at 302. In the absence of such a close temporal
> proximity, we consider the circumstances as a whole, including any intervening
> antagonism by the employer, inconsistencies in the reasons the employer gives for
> its adverse action, and any other evidence suggesting that the employer had a
> retaliatory animus when taking the adverse action. See *LeBoon*, 503 F.3d at 232–
> 33; *Marra*, 497 F.3d at 302; *Farrell*, 206 F.3d at 280–81. The plaintiff, however,
> cannot establish that there was a causal connection without some evidence that the
> individuals responsible for the adverse action knew of the plaintiff's protected
> conduct at the time they acted. See *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir.
> 2007); *Moore*, 461 F.3d at 351; cf. *Ambrose v. Twp. of Robinson*, 303 F.3d 488,
> 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial
> or motiving factor in a decision, the decisionmakers must be aware of the protected
> conduct.").

Daniels, 776 F.3d at 196–97; see Eskridge v. Phila. Housing Auth., 722pp'x 296, 299 (3d Cir.

2018) ("[t]o prove retaliation under Title VII . . . a plaintiff must show that his 'protected activity

was a but-for cause of the alleged adverse action by the employer'") (citing Univ. of Tex. Sw.

Med. Ctr. v. Nassar, 570 U.S. 338, 363 (2013)); Young v. City of Phila. Police Dep't, 651 F.

App'x 90 (3d Cir. 2016) ("To establish causation at the prima facie stage, a plaintiff must

introduce evidence about the 'scope and nature of conduct and circumstances that could support

the inference' of a causal connection between the protected activity and adverse action. At this

stage, 'a plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between

[the] protected activity and the adverse action taken'") (quoting Marra v. Phila. Hous. Auth., 497

F.3d 286, 302 (3d Cir. 2007); Miller v. Thomas Jefferson Univ. Hosp., 565 F. App'x 88, 91 (3d

Cir. 2014) ("'[O]ur case law has focused on two main factors in finding the causal link necessary

for retaliation: timing and evidence of ongoing antagonism'") (quoting Abramson v. William

Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001)).

Concerning temporal proximity, "there is no bright line rule as to what constitutes unduly

suggestive temporal proximity." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217,

233 (3d Cir. 2007). In Eskridge, however, the appellate court recently explained:

> For "temporal proximity" between protected activity and an adverse action to
> establish causation on its own, the gap must be "very close," Clark Cty. Sch. Dist.
> v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per
> curiam) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir.
> 2001)), and we have found gaps even shorter than four months insufficient to prove
> causation, see LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d
> Cir. 2007) ("[A] gap of three months between the protected activity and the adverse
> action, without more, cannot create an inference of causation and defeat summary
> judgment.").

Eskridge, 722 F. App'x at 300; see also Burt v. Lane, Civ. No. 16-1180, 2017 WL 4681807, at

*9 (M.D. Pa. Apr. 4, 2017) (collecting decisions indicating that temporal proximity of seventeen

days, three weeks, seven weeks and between one to three months all were insufficient to alone

establish causation); Victor v. Huber, Civ. No. 12-282, 2012 WL 2564892, at *9 (M.D. Pa. Feb.

28, 2012) ("courts in civil rights cases have frequently rebuffed speculative efforts to infer

causation from temporal proximity when a span of weeks, months or years separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation").

SWVC and DMVA argue Ms. Mazur failed to allege sufficient facts to support any retaliatory intent on the part of the SWVC and DMVA employees who allegedly engaged in the alleged material adverse actions. They emphasize that with respect to Ms. Mazur's allegations of misconduct prior to August 10, 2016, their employees could not have known prior to August 10, 2016, the date of the Notice of Charge of Discrimination sent to them by the EEOC, that Ms. Mazur had filed the First/2016 EEOC Charge in July 2016. Therefore, any conduct undertaken prior to August 10, 2016 cannot be found to have been undertaken in response to Ms. Mazur filing the EEOC charge in July 2016. SWVC and DMVA assert causation cannot be established merely based upon temporal proximity because almost eight months passed between the time when Ms. Mazur filed the First/2016 EEOC charge in July 2016 and April 26, 2017, when Ms. Mazur asserts she was constructively discharged. They contend Ms. Mazur failed to allege facts to support that Mr. Lindsay, her supervisor and the individual whom Ms. Mazur alleges undertook most of the allegedly retaliatory conduct, knew that Ms. Mazur had filed the First/2016 EEOC Charge and, even if he knew of the EEOC Charge, Mr. Lindsay was not a decision maker with respect to any employment decision the defendants made with respect to Ms. Mazur.

It is axiomatic that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." Daniels, 776 F.3d at 197; see Romero v. Allstate Ins. Co., 3 F. Supp. 3d 313, 328 (E.D. Pa. 2014), aff'd sub nom. E.E.O.C. v. Allstate Ins. Co., 778 F.3d 444 (3d Cir. 2015), as amended on reh'g in part (Mar. 26, 2015) ("It is well established that:

[a]n employee cannot establish retaliation without proving that the employer knew that the employee engaged in protected activity. Without knowledge, there can be no retaliatory intent, and thus there can be no causal connection") (citation omitted)). Ms. Mazur did not allege in her amended complaint, and the court did not find in any of the numerous documents incorporated by reference into the amended complaint, facts from which it can be concluded that it is plausible that prior to August 10, 2016, the date of the EEOC Notice of Charge of Discrimination, Mr. Lindsay or any other SWVC and DMVA employee was aware that Ms. Mazur had filed the First/2016 EEOC Charge. While Ms. Mazur argues that she informed both Mr. Ruscavage and Ms. Kreiser about her intent to file an EEO complaint on June 13, 2016 and in support thereof cites to a July 13, 2016 email she sent to Ms. Kreiser, that email does not support this contention. In the email, part of which was attached to Ms. Mazur's motion for leave to file an amended complaint and brief in support of motion to amend and consolidate (ECF Nos. 24, 25) and therefore, a document the court will consider as entirely incorporated into the amended complaint by reference, Ms. Mazur explained that as soon as she came back to work on June 13, 2016, she expressed to Ms. Cuthbert and Ms. McClain-Miller that she had not agreed to the settlement agreement entered into between her employers and her union and concluded "[i]f you still would like to consider this matter closed, I will see you in court as you acted inappropriately in my suspension. You and [McClain-Miller's] decisions/actions are both substantively and procedurally unconscionable, which makes your settlement unenforceable and lacking legal backing." (ECF Nos. 24-1 at 32, 25-2 at 5). Accordingly, given that there are no allegations in the amended complaint that Mr. Lindsay or any other SWVC and DMVA employees knew prior to August 10, 2016, that Ms. Mazur had filed the first EEOC Charge of Discrimination in July 2016, the allegations of misconduct by Mr. Lindsay and other SWVC and DMVA employees

that occurred prior to August 10, 2016, are not relevant and material to the query whether Ms. Mazur pleaded sufficient facts to support the inference of a causal connection between her filing the First/2016 EEOC Charge and SWVC's and DMVA's adverse employment actions that occurred prior to August 10, 2016, with respect Ms. Mazur, i.e. Mr. Lindsay's alleged conduct of regularly berating Ms. Mazur in front of others, unfairly reprimanding Ms. Mazur, and constantly threatening to subject Ms. Mazur to a PDC.

Focusing only upon Ms. Mazur's factual allegations that involve conduct on the part of SWVC and DMVA employees that occurred on or after August 10, 2016, and considering these circumstances as a whole, the court finds that Ms. Mazur did not allege sufficient facts in her amended complaint and other documents from which is it plausible that there was a causal connection between Ms. Mazur filing the First/2016 EEOC Charge in July 2016 and any regular berating of Ms. Mazur in front of others by Mr. Lindsay, any unfair reprimanding of Ms. Mazur by Mr. Lindsay, or any threats to subject Ms. Mazur to a PDC by Mr. Lindsay during this time period. In large part, this conclusion is mandated because Ms. Mazur's failure to allege when the bulk of this alleged misconduct on the part of Mr. Lindsay occurred makes it is impossible for the court to conclude either that there plausibly was unduly suggestive temporal proximity between the protected activity in July 2016 and the alleged adverse employments actions or to decipher from the allegations that there plausibly was a pattern of antagonism between August 10, 2016 and April 26, 2017, when Ms. Mazur resigned from her position. Accordingly, SWVC's and DMVA's partial motion to dismiss Ms. Mazur's amended complaint shall be granted to the extent they seek the dismissal of Ms. Mazur's Title VII retaliation claim that is premised upon Ms. Mazur filing the First/2016 EEOC Charge in July 2016. The dismissal, however, shall be without prejudice to Ms. Mazur filing a motion for leave to file a second

amended complaint against SWVC and DMVA no later than September 4, 2018, that seeks to include a retaliation claim under Title VII relating to her filing the First/2016 EEOC Charge and which includes a proposed second amended complaint. "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004) (citation omitted).

### 4. Ms. Mazur's § 1981 retaliation claim based upon her filing the First/2016 EEOC Charge

Section 1981 provides in pertinent part, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The analysis of a retaliation claim brought pursuant to Title VII and a retaliation claim brought pursuant to § 1981 is identical. Matos v. Merck & Co., Civ. No. 13-2648, 2015 WL 894253, at *13 (E.D. Pa. Mar. 3, 2015), aff'd, 643 F. App'x 187 (3d Cir. 2016). As with Ms. Mazur's Title VII retaliation claim, to maintain a retaliation claim under § 1981, Ms. Mazur must show that "'(1) [s]he engaged in protected activity, (2) [SWVC and DMVA] took an adverse employment action against [her], and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action'." McKnight v. Ambridge Employee Service Corp., 712 F. App'x 165, 168 n. 10 (3d Cir. 2017) (quoting Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010) (citing Moore, 461 F.3d at 340–41); Miller v. Thomas Jefferson Univ. Hosp., 565 F. App'x 88, 91 (3d Cir. 2014) (citing Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007) (a Title VII retaliation case)). A Caucasian/white plaintiff such as Ms. Mazur has standing to bring a § 1981 retaliation claim.

McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 287 (1976) ("Section 1981 is applicable to racial discrimination in private employment against white persons"); Sisco v. J. S. Alberici Const. Co., Inc., 655 F.2d 146 (8th Cir. 1981) (appellate court held that white plaintiff's § 1981 retaliation claim based upon defendant terminating, and not rehiring, the plaintiff because he had complained that he was discriminated against because of his race, was a viable claim); see Bullington v. Jefferson Southern Corp., Civ. No. 16-0245, 2017 WL 6586120, at *14 (N.D. Ga. Sept. 15, 2017) (where Caucasian plaintiff brought § 1981 claim alleging that he was discharged in retaliation for complaining about racial discrimination, court granted employer's motion for summary judgment solely based upon the plaintiff's failure to establish a causal connection between the protected conduct and the materially adverse employment action, and not because of the plaintiff's race).

For the same reason SWVC's and DMVA's partial motion to dismiss Ms. Mazur's Title VII retaliation claim based upon her filing the First/2016 EEOC Charge shall be granted, i.e., Ms. Mazur's failure to allege a plausible causal connection between her filing the First/2016 EEOC Charge in July 2016 and SWVC's and DMVA's alleged adverse employment actions, so too must SWVC's and DMVA's partial motion to dismiss Ms. Mazur's § 1981 retaliation claim based upon her filing the First/2016 EEOC Charge be granted. Said dismissal, however, shall be without prejudice to Ms. Mazur filing a motion for leave to file a second amended complaint against SWVC and DMVA no later than September 4, 2018, that seeks to include a retaliation claim under § 1981 relating to her filing the First/2016 EEOC Charge and which includes a proposed second amended complaint. Alston, 363 F.3d at 236.

## VI.  <u>Second Amended Complaint</u>

Federal Rule of Civil Procedure 8(a) requires a pleading such as an amended complaint to contain "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(1), (2). Each allegation contained in the pleading must be "simple, concise, and direct." <u>Id.</u> at 8(d)(1). "Taken together," Rules 8(a) and 8(d)(1) "underscore the emphasis placed on clarity and brevity by the federal pleading rules." <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d 696, 702 (3d Cir. 1996) (citation omitted).  As explained by the court in <u>Smith v. Director's Choice, LLP</u>, Civ. No. 15-81, 2016 WL 7165739 (D.N.J. July 28, 2016), clarity and brevity is necessary because "'unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage'." <u>Smith</u>, 2016 WL 7165739, at *2 (quoting <u>Cooke v. Deschaine</u>, Civ. No. 16–138, 2016 WL 3579070, at *2 (D. Conn. June 28, 2016) (quoting <u>Salahuddin v. Cuomo</u>, 861 F.2d 40, 42 (2d Cir. 1988)). Thus, "[a] court may dismiss a complaint that contains unnecessary factual detail as violating the 'short and plain statement' requirement of Rule 8." <u>Id.</u> (citations omitted).

Ms. Mazur's proposed second amended complaint, if she chooses to file a motion for leave to file a second amended complaint to include Title VII and § 1981 retaliation claims against SWVC and DMVA based upon her filing the First/2016 EEOC Charge in July 2016, must consist of one stand-alone document, must contain within the body of the pleading all factual allegations upon which Ms. Mazur relies in bringing her Title VII and § 1981 retaliation claims against the defendants, and must be organized in a manner from which it is clear upon which facts Ms. Mazur relies for each of her claims. No external documents are to be "incorporated by reference" into the second amended complaint; exhibits can be attached to the

second amended complaint. Failure to follow these instructions will result in the court *sua sponte* dismissing the plaintiff's motion for leave to file a second amended complaint for failure to comply with Federal Rules of Civil Procedure 8.

**VII.**   **Conclusion**

For the reasons stated above, SWVC's and DMVA's partial motion to dismiss Ms. Mazur's amended complaint is granted to the extent that Ms. Mazur's Title VII and § 1981 retaliation claims are based upon her filing the First/2016 EEOC Charge and said claims are dismissed without prejudice.

Ms. Mazur is permitted to file a motion for leave to file a second amended complaint that contains Title VII and § 1981 retaliation claims based upon her filing the First/2016 EEOC Charge no later than September 4, 2018.

An appropriate order follows.


Dated: August 17, 2018                                    BY THE COURT:

                                                          /s/ Joy Flowers Conti
                                                          Joy Flowers Conti
                                                          Chief United States District Judge