# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARGARET MAZUR,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 17-826 |
| | ) | |
| **SOUTHWESTERN VETERANS** | ) | |
| **CENTER & DEPARTMENT OF** | ) | |
| **MILITARY AND VETERANS** | ) | |
| **AFFAIRS,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

**CONTI, Senior District Judge.**

### I.    Introduction

Pending before the court in this racial discrimination action filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e(17) and 42 U.S.C. § 1981, are dueling motions for summary judgment filed by pro se plaintiff Margaret Mazur ("Mazur") and by her employers, defendants Southwestern Veterans Center ("SWVC") and the Department of Military and Veterans Affairs ("DMVA" and together with the SWVC, "defendants"). The case arises out of an incident in which $500.00 went missing from the SWVC. Defendants initially suspected that Mazur or her coworker Sharon Warden ("Warden") stole or lost the $500.00. Mazur alleges that she did not steal or lose the money and was unfairly disciplined and blamed for the missing money because of her race. Mazur also alleges that defendant harassed her and retaliated against her because she fought against their treatment of her with respect to her role in the missing $500.00.

For the reasons set forth fully in this opinion, defendants' motion for summary judgment will be granted and Mazur's summary judgment will be denied. The undisputed factual allegations in this case show that Mazur is not entitled to relief. In other words, a reasonable jury drawing all reasonable inferences in favor of Mazur could not find that defendants disciplined or harassed Mazur because of her race or that they retaliated against her for engaging in protected activity. Mazur did not set forth any other cognizable claims for relief. Under those circumstances, judgment will be entered in favor of defendants and against Mazur.

## II.     Procedural History

On June 22, 2017, Mazur initiated this case by filing a complaint under Title VII and § 1981 against defendants. (ECF No. 1.) On August 11, 2017, defendants filed an answer to the complaint. (ECF No. 11.) On January 14, 2018, Mazur filed a first amended complaint setting forth the following claims: (1) race discrimination in violation of Title VII; (2) disparate treatment in violation of Title VII; (3) hostile work environment "based on an ongoing pattern of harassment in retaliation for…Mazur having filed the…EEOC case on race and disparate treatment[;]" (4) retaliation in violation of Title VII; and (5) retaliation in violation of § 1981. (ECF No. 36 ¶ I.)

On February 12, 2018, defendants filed a partial answer to the first amended complaint (ECF No. 42), a partial motion to dismiss (ECF No. 43), and a brief in support of the motion (ECF No. 44). Defendants sought to dismiss Mazur's claims of retaliation based upon Mazur filing her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 2, 2016. (ECF Nos. 43, 44.) Defendants did not argue the claims of retaliation based upon Mazur complaining to her superiors about disparate treatment and racial discrimination beginning on June 15, 2016, should be dismissed. (ECF No. 96 at 20.) On February 17, 2018, Mazur filed a response in opposition to the motion to dismiss. (ECF No. 45.) The court granted the partial motion

to dismiss with respect to Mazur's claims of retaliation based upon filing her first charge of discrimination with the EEOC, of which defendants received notice on August 10, 2016. (ECF No. 96 at 34.) The court explained that Mazur did not set forth factual allegations sufficient to show plausibly that there was a causal connection between Mazur filing her first charge of discrimination with the EEOC and defendants taking an adverse employment action against her. (Id. at 30-31.)

On September 12, 2018, Mazur filed a motion for leave to file a second amended complaint. (ECF No. 110.) Mazur in the second amended complaint set forth the same claims stated in the first amended complaint and sought leave to assert the retaliation claim based upon the Notice of Charge of Discrimination dated August 10, 2016, which was addressed to an employee at the DMVA. (Id.)  The court denied Mazur's motion for leave to amend because she did not set forth factual allegations sufficient to cure the deficiencies cited by the court in its opinion setting forth the reasons it granted the partial motion to dismiss the retaliation claim based upon the Notice of Charge of Discrimination dated August 10, 2016. (ECF No. 117 at 6.)

On January 17, 2019, Mazur filed a motion for summary judgment (ECF No. 121), brief in support of the motion (ECF No. 122), and concise statement of material facts (ECF No. 123). On January 18, 2019, defendants filed a motion for summary judgment (ECF No. 126), a brief in support of the motion (ECF No. 127), a concise statement of material facts (ECF No. 128), and an appendix (ECF No. 129). On January 29, 2019, Mazur filed an amended brief in support of the motion for summary judgment. (ECF No. 132.) On February 15, 2019, Mazur filed a response in opposition to defendants' motion for summary judgment (ECF No. 135) and a responsive concise statement of material facts (ECF No. 136). On February 18, 2019, defendants filed their response in opposition to Mazur's motion for summary judgment (ECF No. 137), a responsive concise

statement of material facts (ECF No. 138), and an appendix (ECF No. 139). On March 1, 2019, Mazur and defendants each filed a reply brief. (ECF Nos. 140, 141.)  On March 14, 2019, the combined concise statements of material facts were filed. (ECF Nos. 142, 143.)

On August 11, 2019, Mazur filed a motion to compel a name-clearing hearing, which raises issues related to the issues raised in the motions for summary judgment. (ECF No. 159.) On August 21, 2019, defendants filed a response in opposition to the motion. (ECF No. 161.) On August 21, 2019, Mazur filed a reply brief. (ECF No. 162.)

The motions for summary judgment, having been fully briefed, are now ripe to be decided by the court.

### III.    Factual Background

The factual background is derived from the undisputed evidence of record and notes the disputed facts of record. With respect to the dueling motions, each disputed fact is to be viewed in the light most favorable to the nonmoving party for each motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Because defendants' motion is being granted, all the disputed facts described below are viewed in the light most favorable to Mazur.

### A. Background about the DMVA and the SWVC

The DMVA is part of the Executive Department of the Commonwealth of Pennsylvania ("Commonwealth"). 71 Pa. Stat. § 61(a); Defendants' Combined Concise Statement of Material Facts ("DCCSMF") (ECF No. 143) ¶ 1.) The DMVA's central administrative offices are located in Fort Indiantown Gap ("FIG"), which located in Lebanon County, Pennsylvania. (DCCSMF (ECF No. 143) ¶ 2); (ECF No. 129-2 ¶ 2.) The DMVA operates six veterans' homes throughout the Commonwealth, including the SWVC. (DCCSMF (ECF No. 143) ¶ 6.) The veterans' homes

4

fall under the jurisdiction of the Bureau of Veterans Homes ("BVH"). (Id.) The BVH is headed by a director. (Id.)

During the relevant time period, Andrew Ruscavage ("Ruscavage") served as the director of the BVH. (DCCSMF (ECF No. 143) ¶ 6.) Kim Kreiser ("Kreiser") was a division chief in the DMVA's human resources office at FIG at the times relevant to this litigation. (DCCSMF (ECF No. 143) ¶ 3); (ECF No. 129-2 ¶ 3.) Jennifer McClain-Miller ("McClain-Miller") was a labor relations analyst in the DMVA's human resources office at FIG at the times relevant to this litigation. (DCCSMF (ECF No. 143) ¶ 4; ECF No. 129-9 at 9.)

The DMVA has Standards of Conduct and Work Rules. (ECF No. 129-1) "These work rules constitute the general rules applicable to employees of the Department of Military and Veterans Affairs[,]" and cover topics including "Work Performance[,]" "Time and Attendance[,]" "Safety Standards[,]" "Use of Property[,]" and "Unauthorized Behavior[.]" (Id. at 2-5.)

Each veterans' home under the operation of the DMVA is headed by a Commandant, who is assisted by a Deputy Commandant. (DCCSMF (ECF No. 143) ¶ 7.) At the SWVC, during the relevant time period, Rich Adams ("Adams") served as the Commandant and Barry Lowen ("Lowen") served as the Deputy Commandant. (Id.) Jamie Cuthbert ("Cuthbert") was the human resources analyst ("HR analyst") at SWVC at the times relevant to this litigation. (DCCSMF (ECF No. 143) ¶ 8.)

The SWVC has an accounting department that is responsible for aspects of the financial operation of the SWVC. At the times relevant to this litigation, Darren Lindsay ("Lindsay") was the accountant at the SWVC and supervised the accounting department. (ECF No. 129-2 ¶ 9.)

**B.  Mazur's Employment with the SWVC**

Mazur, who is white, was employed by the DMVA at the SWVC until she resigned on April 27, 2017. (DCCSMF (ECF No. 143) ¶¶ 10-11.) Mazur had "fair share" status with the American Federation of State, County and Municipal Employees ("AFSCME"). (ECF No. 129-3 at 58.) At the SWVC, Mazur was initially employed as a clerk typist in the human resources office, but after five months was placed as one of two accounting assistants in the accounting department. (ECF No. 129-3 at 24-25; ECF No. 129-8 at 12-13; ECF No. 129-2 ¶ 10.) Mazur worked with Cuthbert in the human resources office. (ECF No. 123-6 ¶ 17.) When Mazur transferred to the accounting department, she was not on "good terms" with Cuthbert. (Id.)

Mazur was first supervised in the accounting assistant position by Don Shields ("Shields"). (ECF No. 129-3 at 25.) Shields retired and Lindsay became Mazur's supervisor. (Id. at 26-27.) Lindsay is black. (DCCSMF (ECF No. 143) ¶ 15.) Lowen is Lindsay's supervisor. (ECF No. 129-5 at 11.) Lindsay gave Mazur an "outstanding" Employee Performance Review ("EPR") dated May 18, 2016. (ECF No. 129-4 at 46; ECF No. 123-6 at 34.) Lindsay noted that Mazur "did her job well," (ECF No. 129-4 at 60), and considered her dependable, reliable, and honest. (Id.) On a performance evaluation dated May 18, 2016, Mazur was labeled "outstanding." (ECF No. 129-4 at 46.)

Warden was the other accounting assistant at the SWVC, and she worked under both Shield's and Lindsay's supervision. (DCCSMF (ECF No. 143) ¶ 17.) Warden self-identified as "White" on a form provided to her by the SWVC. (ECF No. 129-1 at 7, 9; ECF No. 129-8 at 24.) Adams described Warden's race as "biracial." (ECF No. 129-6 at 41.) Lindsay testified that he was not aware of Warden's "race and color." (ECF No. 129-4 at 53-54.) Lowen testified that he was not aware of Warden's "race or color." (ECF No. 129-5 at 62.) Mazur considered Warden black. (DCCSMF (ECF No. 143) 13.) Mazur was treated with disdain because she did not fit in

6

with Lindsay and Warden. (ECF No. 123-6 ¶ 2.) Lindsay and Warden talked about the "hood," music, television programs, and other things that Mazur did not understand. (Id.) In 2014, Warden failed to count money in her possession prior to leaving for vacation and turning the funds over to Mazur. (Id. ¶ 3.) Mazur witnessed Warden leaving funds unattended while the bank window of the accounting office was open. (Id. ¶ 4.) Warden did not count the money in the money box on a daily basis. (Id. ¶ 5.) If the money box "came up short," she would, therefore, have to "go through two weeks of transactions to try and find the error." (Id.) Warden took "excessive breaks every day." (Id. ¶ 16.) Warden was not disciplined for the foregoing conduct. (ECF No. 123-6 ¶ 16.)

In December 2014, Warden took a week-long vacation. (ECF No. 123-6 ¶ 3.) Prior to leaving for vacation, however, she did not do a "funds turnover count" of the safe and the money box. (Id.) Lindsay had taken seventy-two dollars from the money box and Warden did not know or report it to Lindsay. (Id.) On May 13, 2016, Warden told Lindsay that the money box was short by ninety dollars. (ECF No. 123-6 ¶ 10.) In April 2016, Mazur complained to Lindsay about Warden's performance in the accounting office. (ECF No. 129-3 at 38; ECF No. 129-1 at 35.) Mazur specifically complained that Warden "continually" took breaks while the bank window of the accounting office was open. (ECF No. 123-6 ¶ 5.) Mazur was required to work the bank window while Mazur was on a break. (Id.) Lindsay addressed the complaints with Warden and told Warden that Mazur complained about her. (ECF No. 129-3 at 38.) Warden confronted Mazur and told Mazur that she "stabb[ed]…her in the back." (ECF No. 129-3 at 37.)

In April 2016, Mazur sent an email to Cuthbert to complain about an interaction she had with Warden. (ECF No. 129-3 at 39.) Mazur explained the incident as follows:

> Where Sharon was working the window and I had to go to the bathroom and they were cleaning the main bathroom. And Sharon saw me heading towards the bathroom, where you enter a code to get into. And she leaves the Accounting Office…. She's the only one in there with the window open, and chases me down

7

the hall and bangs on the door and tells me to get out of there, I'm not allowed to use that bathroom. It was basically an incident that was inappropriate.

(ECF No. 129-3 at 39.) According to Mazur, Warden "harassed" other white people about the use of the private bathroom. (ECF No. 129-3 at 40.) Warden, however, "didn't get any punishment" for those incidents. (Id. at 42.) She was told to "knock it off." (Id.) Lindsay was aware that animosity existed between Mazur and Warden. (ECF No. 129-1 at 35.)

On May 13, 2016, Warden reported to Lindsay that ninety dollars was missing from the accounting office. (ECF No. 123-6 ¶ 6.) Lindsay provided ninety dollars of his own money to resolve the discrepancy. (Id.) He said he would get reimbursed once the discrepancy was found. (Id.) Warden was not disciplined for the ninety-dollars discrepancy. (Id. ¶ 16.)

In June 2016, Lindsay became aware that Warden received a haircut "on company time." (ECF No. 129-4 at 57.) Lindsay did not discipline Warden for that conduct. (Id.) Lindsay talked to Warden about not taking smoke breaks while the window of the accounting office was open. (ECF No. 129-4 at 59.)

On or about June 6, 2016, Warden transferred to the human resources office at the SWVC, and she was replaced in the accounting assistant position by Lisa Havrilla ("Havrilla"). (ECF No. 129-3 at 27-28; ECF No. 129-2 ¶¶ 13-14.)

### C.  Mazur's Replenishment Run on May 16, 2016

As employees of the accounting department, Mazur, Warden, and Lindsay would go to the bank to perform a "replenishment run[.]"[1] (ECF No. 123-6 ¶ 11; ECF No. 129-1 at 29, 32; ECF No. 123-6 at 47.) A replenishment run occurs when an employee of the accounting department

---

[1]     Mazur's job description provides that the accounting assistant, among other things: "Replenishes and reconciles the petty cash funds for both the Members and Welfare funds, as needed." (ECF No. 123-6 at 47.)

takes a check from the SWVC written to the employee to the bank to be cashed and delivers the money to the SWVC to replenish the cash on hand in the accounting department. (ECF No. 123-6 at 47; ECF No. 143 ¶ 21.) On May 16, 2016, Mazur went to the bank for several transactions, including cashing a check for $4,784.00 to replenish a petty cash fund used by residents. (ECF No. 143 ¶ 21.) Warden gave Mazur a check for $4,784.00 written to Mazur to be cashed at the bank. (ECF No. 123-1 at 60.) Mazur drove her own vehicle to the bank because a car from the SWVC was not available. (ECF No. 129-1 at 11, 32.) The bank teller counted the money in descending order, i.e., larger bills first followed by lower bills and coins. (ECF No. 129-1 at 32.) As the teller placed the money on the counter, Mazur put the money into the deposit bag, which was a "shopping bag[.]" (ECF No. 129-1 at 32; ECF No. 123-6 at 39, ¶7.) Mazur "went off…[the teller's] sheet[,]" (ECF No. 129-1 at 17), i.e., she "counted the money with the teller off of her sheet[,]" (ECF No. 123-2 at 21). Mazur watched the teller count the money and placed the money in the deposit bag "after it matched…[the teller's] sheet." (Id.)[2] Mazur picked up the deposit bag and her purse and walked toward the door of the bank. (ECF No. 129-1 at 32.) She continued to talk to the bank teller until she walked out the door. (Id.) Mazur walked directly to her car, placed her purse and the deposit bag on the passenger seat, and drove to the SWVC. (ECF No. 129-1 at 32.)

Upon Mazur's arrival at the SWVC in her vehicle, she grabbed her purse and the deposit bag, walked into the SWVC, went to the accounting office, and placed the deposit bag on Warden's chair. (ECF No. 129-1 at 11, 33.) Money had been left unattended in the accounting office in the past, i.e., "[i]n the drawer of file cabinet, on the chair, or under the desk." (ECF No. 129-1 at 61.) The accounting office did not have a specific place to put the deposit bag after a replenishment

---

[2]  Mazur cites Cuthbert's typewritten notes from her predisciplinary conference in support of this fact. (ECF No. 129-1 at 17; ECF No. 143 at 19-20.)

run. (Id.) No one was in the accounting office when Mazur returned from the bank to the SWVC. (ECF No. 143 ¶ 22.) Mazur returned to her desk. (ECF No. 129-1 at 1, 17, 33.) Mazur could see Warden's chair from her chair because Warden's chair was "pulled away from her desk." (ECF No. 129-1 at 11, 18.)  The accounting office was locked and is locked at all times.[3] (Id.)

Approximately five minutes later, (ECF No. 129-1 at 33), Warden returned to her desk, picked up the deposit bag, opened the deposit bag, removed all the money from the deposit bag, and started to count the money at a filing cabinet in the accounting office. (ECF No. 129-1 at 17, 29, 33.) Warden began counting the money out of Mazur's sight. (ECF No. 129-2 at 71.) Approximately one to seven minutes later, (ECF No. 122-1 at 59 ("about a minute later")) (ECF No. 129-2 at 49 (five to seven minutes)); (ECF No. 129-2 at 71 (three to five minutes)), Warden requested Mazur's assistance in verifying the amount of money retrieved from the deposit bag. (ECF No. 129-1 at 29.) According to Warden, Mazur and she "follow the same procedure" and *always* counted the money together, i.e., "[t]he person that went to the bank comes back and counts it with someone else." (ECF No. 129-1 at 61.) According to Mazur, she did not count any money obtained from a bank run unless Warden requested her help. (ECF No. 123-6 at 39 ¶ 8.) Warden would "usually" ask for help counting the money "when it was a busy day or it was getting close to the end of the work day." (Id. ¶ 11.) If Lindsay performed the replenishment run, he would place the deposit bag on top of the file cabinet for Warden to count when she returned to the office. (Id.)

Warden handed Mazur one pack of money at a time.  (ECF No. 123-6 at 40 ¶8.) Each pack was bound by a band that listed the amount of money that was supposed to be contained in the pack. (Id.) Mazur verified that the amount of money contained in each pack matched the amount

---

[3]       Lindsay, Mazur, Warden, maintenance workers, the Commandant, the Deputy Commandant, the Commandant's secretary, and employees in the revenue department had keys to the accounting office. (ECF No. 129-4 at 50.)

of money listed on the band by running the money contained in each pack through a money counter. (ECF No. 123-6 ¶ 8.) Warden reassembled each pack of money. (ECF No. 123-1 at 60.) Once all the money had been run through the money counter, Warden "added it up mentally" and stated the count was off by $500.00. (Id.; ECF No. 123-1 at 60.) Warden considered this her "first count" of the money. (Id.) According to Mazur, however, neither Warden nor she recounted the money to verify that it was $500.00 short. (ECF No. 123-6 ¶ 8.)

Warden called the bank to ask if the bank teller's drawer was $500.00 over. (ECF No. 129-1 at 17.) Warden "counted the money mentally while physically looking at the denominations and adding it in…[her] head." (ECF No. 123-1 at 60.) She considered this her "second count" of the money. (Id.) Warden instructed Mazur to go and search her vehicle for the missing $500.00. (ECF No. 129.1 at 17.) Mazur admitted that she left Warden alone with the money. (ECF No. 129-2 at 71.) Mazur saw Lindsay in the parking lot and told him about the missing $500.00. (ECF No. 129-1 at 17; ECF No. 129-1 at 26.) Mazur asked Lindsay to search her vehicle; he refused. (ECF No. 123-6 at 40.) Warden went outside to smoke a cigarette and spoke to Lindsay about the missing $500.00. (ECF No. 129-1 at 17; ECF No. 129-1 at 26.) The money was left unattended in the accounting office when Warden went outside to smoke a cigarette. (ECF No. 129-4 at 50.)

Mazur and Lindsay returned to the accounting office. (ECF No. 129-1 at 26.) According to Lindsay, they "looked over the money" and verified that it was $500.00 short. (Id.) When Mazur, Warden, and Lindsay returned to the accounting office they discussed the missing $500.00 and its whereabouts. (ECF No. 129-1 at 26, 29, 33.) Specifically, Lindsay and Warden questioned Mazur about her actions going to the bank, while at the bank, and traveling back to the SWVC from the bank. (ECF No. 129-1 at 26, 33.) Lindsay asked Mazur if she verified the money before leaving

the bank. (ECF No. 123-1 at 62.) According to Lindsay and Warden, Mazur responded "no" because she did not have an itemized list. (Id.; ECF No. 129-1 at 26, 29.)

Mazur prior to making a replenishment run "usually" received an itemized list of the quantity of denominations she was going to receive from the bank. (ECF No. 129-1 at 32.) On May 16, 2016, however, Warden did not provide Mazur an itemized list prior to her going to the bank. (ECF No. 129-1 at 26, 29-30,32.) Warden explained that she did not send an itemized list with Mazur because the bank teller was "substituting the denominations according to what was in her drawer." (Id.)

Lindsay, Warden, and Mazur concluded that the missing money was one pack of twenty-dollar bills totaling $500.00. (ECF No. 129-1 at 26.) According to the witness statements provided by Lindsay and Warden, on May 16, 2016, Mazur told them that she received four stacks of twenty-dollar bills each totaling $500.00 from the bank teller. (ECF No. 129-1 at 26, 30.) The bank teller returned Warden's call and informed her that her supervisor and she counted her drawer and the drawer balanced. (ECF No. 123-1 at 61.) At some point Lindsay also called the bank, spoke with the bank manager, Dusty Klavon ("Klavon"), and was informed that the bank teller's drawer balanced. (ECF No. 129-1 at 26.)

Prior to leaving for the day, Warden asked Lindsay to look in her purse. (ECF No. 129-1 at 30.) Warden opened her bag to show Lindsay there was nothing in it. (ECF No. 129-1 at 61.) Lindsay did not search Mazur's car or purse because he was "uncertain of the legal ramifications of…searching…[Mazur's] car" and purse. (ECF No. 129-4 at 51.)

At some time that day, Mazur asked Lindsay to obtain the bank teller sheet from May 16, 2016, which Mazur used to count the money she received for the replenishment. (ECF on. 123-6

at 40 ¶ 10.) Lindsay obtained the bank teller sheet and confirmed that the amount on the teller sheet added up to the amount of the check used for the replenishment. (Id.)

According to Mazur, if anyone other than Lindsay or Warden entered the office and tried to take the deposit bag after she placed it on Warden's chair, she would have notified security, which was located outside the accounting office. (ECF No. 123-6 ¶ 26.)

### D.  Events following Mazur's Replenishment Run on May 16, 2016

### 1.  May 17, 2016

On May 17, 2016, Mazur arrived at work at approximately 7:45 a.m. and "found money laying on the file cabinet unattended." (ECF No. 129-2 at 71.) Mazur notified Lindsay about the unattended money, but "he took no action." (Id.) Mazur began to search the accounting office for the missing $500.00. (ECF No. 129-1 at 33.)

According to the witness statements by Lindsay and Warden, Mazur told Lindsay and Warden that she remembered receiving *five* stacks of twenty-dollar bills each totaling $500.00 because she remembered "going over" the bank teller's itemized list. (ECF No. 129-1 at 27, 67, 33.) According to Lindsay, Mazur told him that Warden sent her to do the replenishment run and upon Mazur's return from the bank Warden counted the money by herself. (ECF No. 129-1 at 27.) Mazur told Lindsay that she wanted the SWVC to perform an investigation into the missing $500.00. (ECF No. 129-1 at 33, 35.)

Lindsay told Lowen about the missing $500.00 and Lindsay went to the bank. (ECF No. 129-1 at 27.) While at the bank, Lindsay asked Klavon to do a formal investigation at the bank about the missing $500.00. (Id.) Klavon reviewed paperwork with Lindsay to show Lindsay that the bank teller's drawer balanced. (Id.) After Lindsay returned from the bank to the accounting

office, he met with Warden and Mazur and implemented deposit and cash replenishment procedures to take immediate effect.[4] (ECF No. 120-1 at 27; ECF No. 123-3 at 2.)

### 2.  May 18, 2016

On May 18, 2016, Lindsay—after discussing the matter with Lowen—contacted the City of Pittsburgh Police Department. (ECF No. 129-4 at 32, 53.) Lowen told Gerard Hrapla, the SWVC fire and safety specialist, to contact the police about the missing $500.00. (ECF No. 129-5 at 83.) Nicole Kolestar ("Kolestar"), an officer with the City of Pittsburgh Bureau of Police, responded to the call from Lindsay and completed an investigative report dated May 18, 2016. (ECF No. 62 at 1.) Lindsay was listed as the "reporting person" on the investigative report. (Id.) Mazur was listed as "suspect #1[;] Warden, who was identified as "black[,]" was listed as "suspect #2[.]" (Id.)

---

[4]     Prior to May 16, 2016, the SWVC did not have in place a funds management procedure. (ECF No. 129-4 at 23.) On May 20, 2016, the SWVC created administrative policies and procedures with respect to fund management issues. (ECF No. 123-3 at 2.) The policies and procedures provide:

- All funds in the safe will be verified by two people at the beginning or end of every work day.
- When replenishing petty cash, two people will verify the amount to be replenished and a check will be written for that amount. The check will be made out to the person that will be going to the bank. All funds and checks must be put in the locked deposit bag before transporting to the bank. The key to the deposit bags must be left here at the facility while the bags are in route and from the bank. The person going to the bank must verify that the funds are correct before the bank teller put [sic] the funds into the deposit bag and locks it.
- Two people must be present when the deposit bag is unlocked here at the facility and the funds must be counted and verified as accurate by initialing the money bands.
- All deposits must be verified by two people before the deposits may be taken to the bank.
- All funds going to the bank and leaving the bank must be transported inside of a locked deposit bag.
- All funds must be secured in the facility safe after verification.

(Id.)

The narrative of the report provides that Kolestar spoke with Lindsay, who informed her that after Mazur went to the bank, she "handed the money which was in a bag to….Warden[, who] counted the money and found that one stack of twenty dollar bills was missing and brought it to Lindsays [sic] attention." (Id. at 2.) Lindsay contacted the police "in case the bank called telling him the right amount of money was given to Mazur[,] which would mean one of his two assistants may have taken the money." (Id.) Lindsay did not want Mazur or Warden to know he contacted the police. (Id.)

### 3. May 19, 2016

On May 19, 2016, Lindsay, Warden, and Mazur provided witness statements. (ECF No. 129-1 at 26-27, 29-30, 32-33.) In Mazur's witness statement, she explained, among other things, that she "felt whatever happened [to the money], happened at the bank." (ECF No. 122-1 at 59.) She wrote: "I certainly didn't think that Sharon took the money so that leaves the bank." (Id.)

### 4. May 23, 2016

On May 23, 2016, Thomas Nee ("Nee"), a detective for the City of Pittsburgh Bureau of Police, wrote a supplemental report, in which he noted that he attempted to contact a manager of the bank, but the assistant manager and manager were unavailable. (ECF No. 62 at 3.)

### 5. May 24, 2016

On May 24, 2016, Nee wrote a second supplemental report. (ECF No. 62 at 4.) Nee spoke with Klavon who informed him that the bank teller's drawer balanced. (Id. at 5.) Klavon also told Nee:

> [T]he surveillance video was reviewed and it's not in a good position, but you can see the note which lists the denominations being handed to Mazur and money. The denominations of twenties is [sic] 5 packs of $500.00 (25-twenties) and because of Mazur having the note she would have known there was 5 packs of twenties…[A]ll the monies given to Mazur were placed in a duffel bag.

15

(<u>Id.</u>)

On May 24, 2016, Mazur's emails at the SWVC were deleted. (ECF No 129-2 at 72.) She was required to notify her supervisor and the information technology department to have her emails restored. (<u>Id.</u>)

**6.   May 25, 2016**

On May 25, 2016, Mazur's emails were restored "but were jumbled and out of order." (ECF No. 129-2 at 72.)

On May 25, 2019, Lindsay provided a second witness statement to the SWVC. (ECF No. 129-1 at 35.) In the second witness statement, Lindsay stated that Mazur told Lindsay that she believed Warden stole the $500.00 "to make…[Mazur] look bad." (<u>Id.</u>) Mazur was "adamant that the investigation…[be] continued." (<u>Id.</u>) Mazur also reported to Lindsay that Warden was "making a lot of mistakes in accounting." (<u>Id.</u>) Lindsay, however, pointed out in his second witness statement that on May 25, 2016, Mazur gave a resident twenty-dollars more than he had in his account. (<u>Id.</u>)

**E.   The Investigation by the SWVC and the DMVA**

Cuthbert, as the HR analyst, usually conducts investigations of employee misconduct at the SWVC. (ECF No. 129-8 at 57.) Cuthbert, however, was not responsible for disciplining employees. (ECF No. 129-8 at 107.) McClain-Miller explained the HR analyst's role in conducting an investigation of employee misconduct as follows:

> [T]he HR analyst is helping sort of corral those documents together because it's her responsibility to relay them to the labor relations office.
>
> She isn't necessarily the person conducting the investigation. It could be the supervisor who is conducting the investigation. She's just been guiding them through, here are the documents that we need, here are things that we'd be looking for. Maybe we need a drawing of a location, maybe we need photographs. Maybe

we need copies of nursing regulations that are applicable. It just depends on the case at hand.

She helps corral that all to us and then she transfers it to a PDF documentation. And at the time what they did was they would drop it to a shared drive where we would access that documentation and review it, discuss it and make a discipline decision.

The analyst typically crafts that discipline letter. Hence, why I [w]as confused by the ones you saw because that was not my letter. So they craft a discipline letter. Convey that back to the analyst. The analyst finishes up any formatting and gets it signed by the appropriate personnel and then the discipline is delivered.

(ECF No. 129-109 at 73-74.) McClain-Miller testified that the person receiving the file about the alleged employee misconduct would want to know the applicable rules that were violated. (ECF No. 129-10 at 80.) He or she would have the legal department involved if there was possible criminal conduct and the need to involve the police. (Id. at 80.)

If a labor relations analyst for the DMVA has questions about the adjudication of a case, he or she will contact the SWVC's HR analyst or the supervisor for assistance. (ECF No. 129-10 at 82.) Neither the HR analyst nor the supervisor is required to submit a proposal about the level of discipline he or she feels is appropriate for the case. (Id. at 82.) For less serious forms of discipline, e.g., oral or written reprimands, a labor relations analyst from the DMVA together with the HR analyst at the SWVC may decide the appropriate level of discipline. (Id. at 83.) For more serious forms of discipline, e.g., five-day suspensions or terminations, people "up the chain of command[,]" e.g., the DMVA's legal department, review the case and determine the appropriate level of discipline. (Id. at 83.)

Because Cuthbert was not present on May 16, 2016, when the money went missing, the investigation was referred to the labor relations department located in the offices in FIG. (Id.)

Someone in the labor relations department instructed Cuthbert to conduct an investigation, i.e., obtain witness statements from Mazur, Lindsay, and Warden and conduct a pre-disciplinary conference ("PDC"), upon her return to work. (Id. at 57, 60.) At some point, McClain-Miller or Kreiser told Cuthbert "to refer everything [with respect to Mazur and the missing $500.00] up to labor relations." (ECF No. 129-8 at 16.) A labor relation analyst from the FIG determines if the documents provided by Cuthbert support issuing discipline. (ECF o. 129-8 at 107.)

Defendants responded to an interrogatory that the PDC on May 26, 2016, was the only investigation with respect to Mazur. (ECF No. 123-3 at 6.) According to Lindsay, however, the investigation by the SWVC with respect to the missing $500.00 included more than conducting Mazur's PDC. (ECF No. 129-4 at 36.)  Lindsay described his role in the ongoing investigation as follows:

> [W]e tried to retrace the steps, and I had to explain ---- give witness statements as to what happened and what I knew about it. So I called in an officer to come in and investigate. We went to the bank to review videotapes to see the transaction that took place.

(ECF No. 129-4 at 36.)

Lowen and Lindsay went to the bank to obtain to ask for the video footage of Mazur in the bank on May 16, 2016. (ECF No. 129-5 at 31.) Lowen recalled that there was "some issue" with the bank's system and its ability to provide to Lowen video footage of Mazur in the bank on May 16, 2016. (ECF No. 129-5 at 30.) The bank gave Lowen "pictures" or "some kind of evidence of it and that was able to be seen." (Id.)

Prior to Mazur's PDC on May 26, 2016, a conference in Lowen's office occurred among Nee, Adams, Lowen, and Lindsay. (ECF No. 129-5 at 46-47; 129-6 at 31-32.) A representative from the legal department of the DMVA was also in attendance. (Id.) Nee appeared at the

conference via telephone. (Id.) Nee said he had enough evidence "to prosecute…or arrest" Mazur. (ECF No. 129-4 at 33.) Nee explained that it was up to the SWVC and the DMVA about how they wanted to proceed. (ECF No. 129-6 at 32.) Lindsay did not see or ask Nee about any of Nee's evidence. (ECF No. 129-4 at 33.) "Detective Nee just basically went over what he discovered or what he thought about the situation, and he said that he had enough evidence to…prosecute or arrest." (ECF No. 129-4 at 63.) Lindsay spoke with Nee on the phone two or three times. (ECF No. 129-4 at 64.)

### F.  Mazur's PDC

#### 1.  Notice of the PDC

On May 26, 2016, at approximately 8:15 a.m., Mazur received a "Written Notice of Pre-disciplinary Conference[,]" which provided that her PDC[5] was scheduled for the same day, i.e., May 26, 2016, at 8:30 a.m. (ECF No. 129-1 at 14; ECF No. 129-2 at 72.) The notice was from Lowen and advised Mazur that the SWVC was "conducting an investigation into allegations concerning…[Mazur's] conduct as an employee…." (ECF No. 129-1 at 14.) The notice listed the following work rules for which Mazur was being investigated:

**Work Performance**
**1.**  Neglect of duty or responsibility, including, but not limited to:
    a.  Failure to perform assigned tasks or a legitimate work assignment.

**Use of Property**
**2.**  Loss of or damage to Commonwealth property through carelessness, neglect or indifferences.
**3.**  Stealing/Theft[.]

**Unauthorized Behavior**

---

[5]    A PDC "is part of an investigation." (ECF No. 129-1 at 59.) Discipline of an employee may or may not result at the end of a PDC. (Id.) An employee is not required to answer any questions at a PDC. (Id.)  An employee has the right to union representation at the PDC. (ECF No. 129-5 at 73.) A PDC is an opportunity for the employee accused of wrongdoing to present his or her "side of the story." (ECF No. 129-8 at 44.)

    **4.**   Any action which would reflect unfavorably on or discredit the Commonwealth or Department of Military and Veterans Affairs.

(ECF No. 129-1 at 14.) The notice also provided:

> The purpose of the conference is to present you with the opportunity to discuss the allegations and to respond in detail to the charges listed above. At the conference, you will be requested to provide your account of the incident being investigated.
>
> Corrective action may or may not be imposed depending on the facts gathered during the investigation.

(Id.)

Mazur contacted Sue Kubla ("Kubla"), who was her union representative, and informed Kubla that she was being "PDC'd." (ECF No. 129-2 at 72.) Mazur, however, did not have an opportunity to speak with Kubla privately prior to the PDC. (Id.) According to McClain-Miller, there is no rule about how much "notice" or time an employee is to receive prior to a PDC. (ECF No. 129-10 at 54.) If an employee requires more time to prepare for a PDC, the union steward may communicate the need to the DMVA. (ECF No. 129-10 at 58.) McClain-Miller would have accommodated a request for additional time to prepare for the PDC from Kubla. (ECF No. 129-10 at 58.) On July 1, 2016, Mazur emailed Richard Caponi ("Caponi") and asked him "how much notice an employer is to give an employee for a PDC[.]" (ECF No. 123-2 at 14.) On July 5, 2016, Caponi responded: "usually 24 hours or more." (Id.; ECF No. 123-2 at 15.)

McClain-Miller explained her understanding of why Mazur was charged at her PDC with neglect of duty:

> Because it was alleged that you were expected to take a check to the bank to retrieve money for the Veterans. Return it to the workplace. Count that cash and then I think it goes into a vault to be secured and that work assignment was not performed optimally as $500 went missing.

(ECF No. 129-9 at 20.)

2.  **The PDC**

On May 26, 2016, at 8:40 a.m., a PDC was held with respect to Mazur's role in the missing $500.00. (ECF No. 129-8 at 45; ECF No. 129-1 at 16.) Mazur, Kubla, Cuthbert, Lowen, Kreiser, and McClain-Miller were present at Mazur's PDC. (ECF No. 129-8 at 46, 66; ECF No. 129-1 at 16.) Kreiser conducted most of the PDC. (ECF No. 129-8 at 46-47.)

According to Mazur, she stated the following during her PDC:

> I counted the replenishment money with the bank teller and verified the amount received was correct by looking at the bank teller sheet (which added up to the amount of the replenishment check), I didn't stop anywhere between the bank and SWVC, I brought the whole amount of replenishment money back from the bank to the Accounting office, and I kept the replenishment money in a locked office where it was in my sight and control at all times until Sharon Warden took possession of the replenishment money. Had anyone other than Sharon Warden or Darren Lindsay entered the Accounting office and took or tried to take the money; [sic] I would have notified security which was just outside the Accounting Office.

(ECF No. 123-6 at 44 ¶ 26.) According to Mazur, the PDC was "a hostile attack with false unproven statements made against…[her]."  (Id.) She explains that she was told: "You left money out of sight and unattended, You had a custom of counting money together, You said you always count the money together, The police have enough to charge you" (Id.)

Cuthbert and Lowen took notes during the PDC. (ECF No. 129-1 at 16.) Following the PDC, Cuthbert typed notes from the PDC based upon the notes taken by Cuthbert and Lowen during the PDC. (ECF No. 129-8 at 46.) The PDC notes compiled by Cuthbert were "not meant to be a true transcription" of what occurred during the PDC. (ECF No.129-9 at 61.) Following the PDC, Cuthbert sent to "labor relations" pictures of the accounting office taken by Lowen, notes from the PDC, and witness statements from Mazur, Warden, and Lindsay. (ECF No. 129-8 at 51; ECF No. 129-1 at 26-27, 29-30; 32-33; 35.)

The PDC typed notes reflected that Mazur explained, among other things, that:

> [The bank teller]…had a sheet with denominations because there were substitutions. So I went off of her sheet. She started with 20's. [sic] After she counted each denomination, I put it in the bag that Sharon gave me. After she was done I put money in the bag and headed to the door. I went straight to my car.

(ECF No. 129-1 at 17.) According to Cuthbert's typed PDC notes, when Cuthbert asked Mazur

*when* she placed the money into the bag, Mazur responded:

> After each counting of denomination. When…[the bank teller] was counting the stacks I was watching her count and then put it into the bag after it matched her sheet.

(Id.) The PDC typed notes reflect that Mazur gave the following account of what happened when

she returned to the SWVC:

> I put the bag in [sic] Sharon's chair because she was not in the office. I went to my desk to work. When Sharon came into the office she took the bag and started taking money out of it. In about a minute she called me over to count the money with her. I initialed the packs as they were counted. As Sharon was counting, she was adding on her calculator. She realized it was $500 short. Sharon called the bank right away and told someone Becky's drawer should be $500 over and please call back. At some point someone called back and said Becky's drawer balanced. In the meantime, Sharon told me to go check my car to see if it was in there. I did and it wasn't'. [sic] I saw Darren in the parking lot. He had newspapers for me. I told Darren of [sic] the problem. Sharon came out with Julia to smoke and said to Darren we have a problem. Darren and I came back in to [sic] office. When Sharon came back, the 3 of us started brainstorming what could happen with $500. The last I remember is $303 in the stack of ones. Every day we go over what could have happened and I keep checking my car because I want this over.

(ECF No. 129-1 at 17-18.) The notes also reflect that:

- Mazur "normally" would not place the money on Warden's chair, but Warden was not there and she felt "comfortable" placing it on the chair because she could hear who came in and out of the office (id. at 18);

- Mazur said she believed there were four suspects: "The teller, the manager at the bank who went to the teller,…[Mazur], and Sharon" (id. 19);

- Mazur wished that she got up and counted the money with Warden when Warden returned to her office (id. at 19-20);

- Mazur did not get up and count the money with Warden when Warden returned to the office because Mazur was "busy" and "a little lax" (id. at 20);

- Mazur offered to take a lie detector test and explained that she did not take the $500.00 (ECF No. 129-1 at 20);

- Mazur blamed Warden and the manager at the bank for taking the money (id. at 20-21); and

- Mazur wished there was a "lockdown immediately in this situation" (id. at 21).

McClain-Miller's recollection from the PDC was that Mazur was asked about whether she recounted the stacks of money at the bank and Mazur responded that she did not. (ECF No. 129-9 at 49.) McClain-Miller testified that Mazur at the PDC explained that she watched the bank teller "marking…[the stacks] and throwing…[them] in the bag, but…[Mazur] didn't take them and recount them…[herself]." (Id.) In other words, McClain-Miller's understanding was that Mazur at the bank counted the packs of twenty-dollar bills as they went into her bag but did not count the bills in the packs. (ECF No. 129-9 at 55.) McClain-Miller gave a witness statement dated November 3, 2016, which included, among other things:

> During her Pre-disciplinary Conference (PDC), Ms. Mazur admitted that she did not check the money at the bank with the teller to ensure she had the correct amount. Ms. Mazur also admitted that she had left the money on Ms. Warden's desk chair. This meant the money was out of Ms. Mazur's custody and pictures of the office floor plan showed that the money was completely out of Ms. Mazur's line of sight. Ms. Mazur further admitted that when she heard Ms. Warden return to the office, Ms. Mazur did not immediately get up and go help Ms. Warden count the money, as is their custom. These factors demonstrated Ms. Mazur's culpability in the missing $500.

> Unfortunately, Ms. Warden did have possession of the cash for a brief moment while out of sight from Ms. Mazur. During Ms. Warden's PDC, she admitted this was the case and explained that she had to call Ms. Mazur to get her to come help count the money. Ms. Warden began counting the money before Ms. Mazur joined her. While this time is very brief and by both employees' accounts was only a matter of a minute or two, Ms. Warden did have custody of the cash unobserved. Therefore, I found Ms. Warden had some culpability [and] sustained the allegation that $500 of the petty cash replenishment was lost because Ms. Warden also failed to maintain proper custody and control of the money.

(ECF No. 129-2 at 32.)

23

McClain-Miller at the time of Mazur's PDC did not know that on May 16, 2016, there were no "prescribed standard[s]" about the replenishment procedures. (ECF No. 129-9 at 29.) McClain-Miller explained, however, that "there are contractual languages for persons who are responsible for cash" and "there are contractual rules about cash handling and the responsibility." (ECF No. 129-9 at 30.) McClain-Miller believed that under those circumstances the "impetus" was on Mazur to secure the money. (Id. at 30-31.) She explained:

> In this case, keeping the money secure, bringing it back, not losing it, I think that doesn't need to be conveyed additionally in writing beyond where it already is.

(ECF No. 129-9 at 32.) According to McClain-Miller, Mazur did not fulfill her duty to secure the money because, as Mazur explained in her PDC, she left it in Warden's office, walked away from the money, and returned to her office. (ECF No. 129-9 at 32.) McClain-Miller believed that Mazur lost the $500.00. (ECF No. 129-9 at 82.) She explained:

> I know it's lost. I know it was in your care. So yes, because you told me it was in your care and because the money was missing, I know that you lost it.

(ECF No. 129-9 at 82.)

McClain-Miller had never been inside the accounting office. (ECF No. 129-9 at 37.) She agreed with Mazur, however, that it is possible to see a portion of Warden's office chair from Mazur's office. (ECF No. 129-9 at 36.)

The notes from the PDC do not reflect that Mazur during the PDC affirmatively stated that she left the money unattended in Warden's office. (ECF No. 129-9 at 40.) McClain-Miller's understanding of what Mazur said, however, was that Mazur admitted to leaving the money unattended in Warden's office. (Id.) McClain-Miller explained:

> We feel that you left the money sitting there unattended. You left it vulnerable. You should have kept it with you and you didn't. It's missing. It's gone. That part is fact. $500 went missing, and it was a resident's money.

(ECF No. 129-9 at 42.) According to McClain-Miller, if Warden stole the $500.00, Mazur "let that happen" by leaving the money unattended. (ECF No. 129-9 at 44.)

In a declaration provided by Mazur, she wrote:

> During the PDC I was verbally attacked and accused of theft and accused of not counting the money at the bank and leaving the money unattended. I denied all charges and repeatedly stated that I did not steal or lose the money and that I brought the entire amount to the accounting office from the bank. I told the PDC attackers that I had the money in my possession and sight at all times until Sharon Warden took possession. I was accused of leaving the money unattended and I never did.

(ECF No. 129-2 at 72.)

McClain-Miller believed Mazur was more culpable than Warden for the missing $500.00: "I'll continue to believe that you should have kept the money with you and you should have kept it secure and it's lost when it was in your care." (ECF No. 129-10 at 33.) McClain-Miller, however, believed that Warden should be disciplined because she had "some culpability" for the missing $500.00. (Id.) Mike Barrett ("Barrett"), the DMVA's chief legal counsel, agreed with McClain-Miller. (Id. at 33-34.) McClain-Miller explained:

> [I]t was your responsibility to get the money. You were assigned to go to the bank. To retrieve the money. To count the money. To bring it back, to keep it secured. To count it with Sharon and then, I guess, secure it in the vault where the petty cash goes.
>
> You left it on the chair, you walked away from it. You were distracted. You let her pick it up without being with her. That's your culpability. The money is missing. You thought maybe the bank took it. You thought maybe the manager did it.
>
> That tells me you knew the money wasn't secure even at the bank because you thought maybe the bank took it. That was your responsibility to secure that money.

(ECF No. 129-10 at 37.) McClain-Miller testified that Mazur "changed…[her] story multiple times." (ECF No. 129-10 at 47.)

Lowen considered the following evidence that Mazur stole or lost the $500.00:

> That you, on that day, were tasked to go to the bank for replenishment and you did
> so. And when you came back, $500 was short from the amount that you were
> supposed to have control of.

(ECF No. 129-5 at 31.)

At the conclusion of the PDC, Cuthbert presented Mazur a letter of suspension without pay[6] dated May 26, 2016. (ECF No. 129-8 at 62; ECF No. 129-1 at 37-38.) A suspension without pay "means that they're investigating the case and the person that was suspended is not working or getting paid for the days that they're not working." (ECF No. 129-4 at 35.) The letter of suspension was signed by Adams prior to the PDC.[7] (ECF No. 129-1 at 37.) The letter provided, among other things:

- the suspension without pay was "pending further investigation into allegations
  of Violation of the Standards of Conduct and Work Rules, more specifically,

---

[6]    The DMVA has a policy, which provides that an employee may be suspended without pay pending the outcome of an investigation and final determination with respect to the employee's wrongdoing. (ECF No. 123-6 at 23.) There are eight non-exclusive factors the agency, e.g., the SWVC, should consider in making its preliminary determination:

    (1) The employee's explanation, if available;
    (2) The extent to which allowing the employee to continue in his or her position would
        be detrimental to the physical well-being of the employee, his or her follow
        workers, or other persons;
    (3) The nature of the employee's duties, including the amount of discretion exercised
        as part of those duties;
    (4) The nature, weight, basis and source of the accusations against him or her;
    (5) The relationship of the accusations to the employee's duties;
    (6) The extent to which the employee must deal directly with the public;
    (7) The extent to which the accusations of wrongdoing may affect the publics trust and
        confidence in the employee, the agency, and state government; and
    (8) Any undue hardship to the employee which would result from his or her temporary
        reassignment.

(ECF No. 123-6 at 23.)

[7]    The human resources office at the DMVA gave the letter to Adams to sign. (ECF No. 129-6 at 42.) Adams read the letter and signed it. (ECF No. 123-1 at 35.)

Work Performance: Neglect of Duty, Use of Property: Loss of Commonwealth property and stealing/theft, and Unauthorized Behavior" (id.);

- "[a]t the conclusion of this investigation appropriate action will be taken…" (id.);

- if the investigation revealed no wrongdoing on Mazur's part, "the suspension …[would] be retracted and expunged from all records, with the employee receiving back pay for the full period of suspension" (id.); and

- Mazur's position was covered by a bargaining unit, and therefore, she could appeal the suspension without pay pending investigation in accordance with Mazur's labor agreement's grievance procedure (id.).

Following the PDC, Cuthbert escorted Mazur to her office and instructed her to turn in her keys and badge and place her personal belongings in a box. (ECF No. 129-2 at 72.) Mazur was escorted out of the building to her car. (Id.) Cuthbert informed Mazur that she was "no longer allowed on SWVC grounds." (ECF No. 94-4 ¶ 11.) Cuthbert did not know who made the decision to suspend Mazur. (ECF No. 129-8 at 23.)

### G.  Proposal for Mazur's Discipline

A document dated May 26, 2016, was entitled "Results of Pre-Disciplinary Conference and Proposal for Discipline, If Applicable" was addressed to Adams, and was from Lowen. (ECF No. 123-3 at 11.) It provided that Mazur was charged with "Violation of DMAVA/SWVC Policies and Procedures, Standards of Conduct, Work Rules." (Id.) The document also provided:

> The employee was scheduled for a Pre Disciplinary [sic Conference (PDC) via a PDC Memo dated 5/26/2016. The PDC occurred on 5/26/2016 with Barry Lowen, Jamie Cuthbert, Margaret Mazur, and Sue Kubla, Union Representative, present. Also, present via telephone conference were Kim Kreiser, Chief of Employee Relations, and Jennifer McClain-Miller, Labor Relations Analyst.

(ECF No. 123-3 at 11.)

### H.  Mazur filed for Unemployment Compensation

On the same day, i.e., May 26, 2016, Mazur filed for unemployment compensation benefits. (ECF No. 129-3 at 65.) Mazur believed that she would eventually be terminated. (ECF No. 129-3 at 71.) Mazur told the unemployment compensation officials that she was "suspended, terminated, pending a theft charge." (ECF No. 129-3 at 72.) Mazur's unemployment compensation claim was initially denied. (ECF No. 129-3 at 73.) Adams at the hearing on Mazur's request for unemployment compensation acknowledged that Mazur was not a thief. (ECF No. 129-6 at 13.)

According to Mazur, her unemployment compensation claim was denied based upon "seven false statements" given to the unemployment compensation representative by Cuthbert. (ECF No. 123-6 ¶ 23.) The Notice of Determination from the Pennsylvania Department of Labor and Industry with respect to Mazur's claim for unemployment compensation contained the following "findings of fact:"

1. The Claimant last worked on 5/25/2016.
2. The Claimant was discharged for alleged dishonesty.
3. The alleged dishonest act involved theft of money from her department.
4. The incident which caused the separation was due to the Claimant's unsatisfactory work performance on the job.
5. The Claim did not perform the job to the best of her ability.
6. The Claimant's reason(s) for her actions was that she has gone to pick up the money many times and there was no procedure in place different than what she did.
7. The Claimant admitted to her Employer; she did not count the money at the bank.

(ECF No. 123-5 at 4.) Cuthbert testified that she read "the allegations which are on the suspension letter…as they are stated" to the unemployment compensation representative and told her that Mazur admitted that she did not count the money at the bank. (ECF No. 129-8 at 84-88.) Cuthbert did not tell the unemployment compensation representative that: Mazur was discharged for alleged dishonesty; Mazur's "separation" was caused by her "unsatisfactory work performance[;]" or Mazur did not "perform the job to the best of her ability." (Id. at 84-86.)

On June 27, 2016, Pamela Long ("Long"), a HR analyst for the DMVA emailed Cuthbert a "UC Notice of Determination" that provided Mazur's unemployment compensation claim would be denied. (ECF No. 123-3 at 24.) Long wrote that she "never received any questionnaires" with respect to Mazur's request for unemployment compensation. (Id.) Cuthbert responded that she gave the unemployment compensation representative "the information[.]" (Id.) According to defendants, the unemployment compensation representative was informed that Mazur's case was pending and she had not been terminated. (ECF No. 123-3 at 26.) Defendants deny telling the unemployment compensation representative that Mazur was "discharged for alleged dishonesty" or that "[t]he alleged dishonest act involved theft of money from her office." (Id.)

On or about July 8, 2016, Mazur requested from defendants all information that defendants used to suspend her without pay and sent to the unemployment compensation office. (ECF No. 123-5 at 13.)

### I.   Mazur Emails to Cuthbert on June 1, 2016

On June 1, 2016, Mazur emailed Cuthbert stating:

> It is clear that there is not a fair investigation going on as I am suspended without pay and Sharon is still at work. I made one mistake of not handing the bag of money directly to Sharon when she walked in the door, now my world is turned upside down. You are barking up the wrong tree pinning the theft on me.

(ECF No. 129-1 at 66.) Mazur requested six categories of information from Cuthbert. (Id.) Mazur followed up with three more emails without a response from Cuthbert. (Id.) On the same day, Cuthbert informed McClain-Miller that Mazur was contacting her coworkers for information with respect to her suspension. (ECF No. 129-2 at 29.) According to Cuthbert, Mazur contacting employees at the SWVC while Mazur was suspended and during business hours constituted Mazur impeding the investigation with respect to her role in the missing $500.00. (ECF No. 129-8 at 21.)

On the same day, McClain-Miller spoke with John Galuska ("Galuska"), Mazur's union representative, and asked him to remind Mazur that there was an ongoing investigation and that she should cease contacting her coworkers about the case. (Id.)

### J.   The Filing of a Grievance with respect to Mazur

#### 1.   The Grievance Process

The grievance process via the employee union was the appeal process for employees who received discipline. (ECF No. 129-7 at 78.) There are three steps to the grievance process. (ECF No. 123-6 ¶ 19.) Cuthbert described step one of the grievance process, which takes place after a grievance is filed, as follows:

> A date is determined when they're going to hear them, and both parties, both sides of the --- parties are supposed to be prepared and that would be management as well as then union. They both have their supporting documentation. They present it to each other, the Union representative and the labor management representative. And they both have to sign off on each other's packets, that they received it, and then they begin negotiating it, I guess.

(ECF No. 129-8 at 38.)

#### 2.   Filing of Grievance

On June 1, 2016, McClain-Miller reached out to Galuska to ask him to tell Mazur to stop contacting employees of the SWVC during her suspension. (ECF No. 123-4 at 68.) On the same day, McClain-Miller and Galuska began to talk about about a "pre-grievance settlement" with respect to Mazur. (Id. at 7.)

On the same day, Mazur's union steward, Rita Thomas ("Thomas"), filed a grievance allegedly on Mazur's behalf for "unfair and unjust suspension from position of accounting department." (ECF No. 129-1 at 40; ECF No. 129-10 at 52; ECF No. 129-3 at 58.) The grievance form provided space for the "Steward Signature…and/or…Employee Signature." (ECF No. 129-

1 at 40.) Thomas signed the grievance form; Mazur did not. (Id.) According to Mazur, she did not know about the grievance or initiate its filing. (ECF No. 123-6 ¶ 19.) The grievance form provided that the "relief or remedy sought" was "return employee back to her position and make her whole by giving her back pay, all benefits, holiday, personal, annual time, etc." (ECF No. 129-1 at 40.) The grievance was received by McClain-Miller on or about June 2, 2016. (ECF No. 129-1 at 43; ECF No. 129-9 at 64.)

### 3.  Mazur Emailing Coworkers While Suspended

On June 2, 2016, McClain-Miller learned that Mazur sent Lindsay an email, and McClain-Miller again asked Galuska to notify Mazur that she must cease contacting employees of the DMVA because it "is considered interference with the investigation." (Id. at 30.) On the same day, Cuthbert informed McClain-Miller that Mazur was continuing to contact DMVA employees via the "Enterprise Network" from her home. (ECF No. 129-2 at 30.) The information technology department at the SWVC was instructed to suspend Mazur's email account. (Id.) On June 2, 2016, Cuthbert sent an email to Kreiser and McClain-Miller that provided, in pertinent part: "I had asked security to send an e-mail to Vince to suspend Margaret's account on the day of her **termination**."[8] (ECF No. 123-3 at 23 (emphasis added).) On the same day, McClain-Miller responded to Cuthbert's email, writing, in pertinent part: "Regarding the invoice e-mail below, do I misunderstand what I am seeing? It looks like Ms. MAZUR is performing duties **while suspended**." (Id. (emphasis added).) Mazur, however, was emailing employees of the DMVA

---

[8]     Cuthbert testified that she used "suspension, termination, separation…interchangeably." (ECF No. 123-1 at 38.) She conceded that in her email she used the word "termination" to refer to Mazur's "absence" from her employment with the SWVC. (Id.)

from her personal email account. (Id.) McClain-Miller contacted Mazur to notify her to cease

contacting employees of the DMVA. (Id.)

### 4. The Offer of Settlement

On June 2, 2016, a meeting was held by Barrett, Steve Bushinski, Ruscavage, Kreiser,

McClain-Miller, Adams, Lowen, and Cuthbert. (ECF No. 129-10 at 8; ECF No. 129-10 at 32)

During that meeting it was decided that neither the SWVC nor the DMVA would pursue the

criminal charges of theft against Mazur.[9] (ECF No. 129-10 at 9.) "[A] collaborative decision was

made to **offer** [Mazur] a settlement for a time-served suspension with a final warning." (ECF No.

123-3 at 10; ECF No. 123-4 at 7 (emphasis added).) The decision was "finalized" by Barrett. (ECF

No. 123-5 at 9; ECF No. 129-10 at 86.) "[L]ots of people had thoughts on the matter," but Barrett

made the final decision. (ECF No. 129-10 at 86.)

McClain-Miller "fought" for Mazur during the meeting. (ECF No. 129-9 at 86, 89.) She

explained:

> We didn't know you took it. We have no proof that you took it. It was missing, yes,
> and that was tragic, sure. But we didn't know that you stole it. And quite frankly, it
> doesn't matter.

(ECF No. 129-9 at 86.) McClain-Miller believed that Mazur could learn from the circumstances

surrounding the missing $500.00 and her "employment relationship" with the SWVC was

"worthwhile" and could be salvaged. (ECF No. 129-9 at 88.) McClain-Miller explained:

> We have tried so hard to get you to understand that you are worth keeping, that you
> were a good employee. It breaks my heart, honestly, that here we are two years later
> and we're still trying to tell you the same thing.

---

[9]      McClain-Miller testified that the SWVC did not pursue criminal charges against Mazur
because "they took pity on…[her]." (ECF No. 129-9 at 86.)

(ECF No. 129-9 at 88.) McClain-Miller as of the time of her deposition in this case had not seen the police report. (ECF No. 129-9 at 4.)

Defendants, in a response to an interrogatory posed by Mazur, wrote that *prior to June 1, 2016*, "a decision had been made regarding the discipline to be imposed, and that it would be a time-served suspension." (ECF No. 123-2 at 28.)

### 5.   The Grievance Settlement

On June 6, 2016, Kreiser advised McClain-Miller via email to "[t]ry for a pre-grievance settlement" for Mazur. (ECF No. 129-1 at 45.) On June 7, 2016, Galuska called Mazur and said he would going to meet with McClain-Miller on June 8, 2016 "to discuss bringing…[Mazur] back to work." (ECF No. 123-6 ¶ 20.) Mazur told Galuska that she did not want him to represent her "unless he was going to demand and require any evidence or proof that…[she] was guilty of any of the charges against…[her]." (Id.) On the same day, McClain-Miller advised Kresier that she negotiated a "pre-grievance settlement"[10] with Galuska with respect to Mazur. (ECF No. 129-1 at 47.) McClain-Miller planned to have Galuska sign off on the agreement on June 8, 2016. (Id.)

On or about June 8, 2016, Galuska and McClain-Miller each signed a letter setting forth a settlement agreement with respect to Mazur while attending an AFSCME state-wide meeting. (ECF No. 129-1 at 49; ECF No. 129-2 at 30.) Prior to signing the letter, Galuska used his mobile telephone to call Mazur. (ECF No. 129-2 at 30.) According to McClain-Miller, Galuska explained to Mazur the terms of the settlement; indeed, he read it to her "word for word." (Id.) McClain-Miller testified that she explained to Mazur that the DMVA sustained the charge against her that

---

[10]     A DMVA policy provides that "[s]ettlements at the agency level should be used to rectify a situation where due process and/or just cause did not exist for a disciplinary action." (ECF No. 94-19 at 2.)

she lost funds in her case, but not that she had stolen them. (<u>Id.</u> at 30-31.) According to McClain-Miller: (1) Galuska asked Mazur if she understood and accepted the terms of the settlement and Mazur said "yes[;]" and (2) Galuska asked Mazur if he could sign the settlement agreement and she responded "yes." (<u>Id.</u>) According to McClain-Miller, Mazur "took culpability" for the missing $500.00. (ECF No. 129-9 at 45.)

According to Mazur, however, she was not present during any grievance discussions, (ECF No. 123-6 ¶ 19); rather, Galuska handed the telephone to McClain-Miller, who said: "[H]ey, we want you to return to work today." (ECF No. 123-6 at 11.) Mazur testified before the unemployment compensation board that McClain-Miller did not mention the settlement agreement. (<u>Id.</u>) Ruscavage testified that he was "not aware that…[Mazur] were [sic] not in line with…[the union] or any of that." (ECF No. 129-7 at 61.)

Mazur pursuant to the settlement agreement received a time-served suspension with a final warning. (ECF No. 129-1 at 49.) She was suspended without pay from May 27, 2016, through June 7, 2016. (<u>Id.</u>) The reason for the suspension was stated as: "Mazur's failure to abide by the Department's Standards of Conduct and Work Rules[, i.e.,]…Mazur was charged with Work Performance, 1. Neglect of Duty; and Use of Property, 2. Loss or damage." (<u>Id.</u>)

A discipline letter dated June 8, 2016, provided that the discipline letter was issued as a result of the settlement of Mazur's grievance and that Mazur was disciplined for violating policies by neglecting her duty and losing property. (ECF No. 129-1 at 56.) The letter explained:

> [O]n May 16, 2016, you failed to maintain proper custody and control of the petty cash replenishment. As a result, $500 was lost. A Pre-Disciplinary Conference was held with you on May 26, 2016; however, you provided no acceptable explanation for your actions.

(<u>Id.</u>) The discipline letter dated June 8, 2016, also provided:

> **THIS IS A FINAL WARNING.** Any infraction(s)/offense(s) of a similar or related nature occurring after the date of settlement will result in your termination.

(ECF No. 129-1 at 56.) A copy of Mazur's employee suspension letter, which contained the final warning, would be "permanently kept" in her personal file. (ECF No. 123-4 at 3.)

On June 8, 2017, McClain-Miller emailed Lowen, Cuthbert, Lindsay, Richard L. Murray, and Kreiser to inform them that she "successfully negotiated a settlement agreement regarding the suspension of…MAZUR." (ECF No. 129-1 at 51.) McClain-Miller explained in the email that Mazur had "pre-planned, pre-approved absence for June 9 and 10, 2016[.]" (Id.)

On June 9, 2016, McClain-Miller sent an email to Cuthbert and Lowen attaching Mazur's discipline letter dated June 8, 2016. (ECF No. 129-1 at 53.) On the same day, McClain-Miller wrote an email to Galuska informing him that Mazur would be provided a copy of the discipline letter when she returned to work "on Monday" and the language of the letter would "mirror…[their] agreement." (ECF No. 129-1 at 42.) On the same day, Galuska responded to McClain-Miller's email writing "Ok[.]" (Id.)

On June 11, 2016, Mazur[11] sent an email to Galuska, in which she wrote:

> Could you please give me a run down on what happened in the meeting when you went to the GAP and met with Jennifer? Please tell me what was said for them to agree for me to come back to work.

---

[11]  Twice via telephone Mazur spoke with Galuska's boss, Rich Caponi ("Caponi"). (ECF No. 129-3 at 59.) Mazur discussed with Caponi that Caponi did not respond to her emails, Galuska did not contact her about her PDC concerns, and all the incidences leading up to the final warning. (ECF No. 129-3 at 59.) Mazur requested the union's file about her case. (Id. at 60.) Caponi provided the file to Mazur; there was hardly anything in the file. (Id.) After receiving the file, Mazur contacted Galuska who informed her the discipline case against her was closed. (ECF No. 129-3 at 61.)

Mazur did not contact the union about the alleged harassment she received upon her return to work in June 2016. (ECF No. 129-3 at 61.) Mazur did not file a complaint against the union because the statute of limitations to do so had passed. (ECF No. 129-3 at 61.)

(ECF No. 123-4 at 13.)

### K.  Warden's Discipline

#### 1.  Warden's PDC

On June 2, 2016, Warden[12] was given notice of her PDC, which was scheduled for June 3, 2016. (ECF No. 129-6 at 54.) Warden was being investigated for violating the following "Standards of Conduct and Work Rules:"

> Work Performance
> 1.  Neglect of duty or responsibility, including, but not limited:
>     a.  Failure to perform assigned tasks or a legitimate work assignment.
>
> Use of Property
> 2.  Loss of or damage to Commonwealth property through carelessness, neglect, or indifferences.
>
> Unauthorized Behavior
> 5. Any action which would reflect unfavorably on or discredit the Commonwealth or Department of Military and Veterans Affairs.

(ECF No. 129-1 at 59.)

#### 2.  Proposal

Lindsay's name is listed in the "from" section of a document dated June 3, 2016, and entitled "Results of Pre-Disciplinary Conference and Proposal for Discipline, If Applicable" with respect to Warden. (ECF No. 129-4 at 55-56; ECF No. 123-3 at 12.) Lindsay prior to being deposed in this case had not seen the document and did not know who drafted the document. (Id.) Adams testified that if a document provides that it was from Lindsay, he would not expect

---

12      Mazur learned that while she was suspended, Warden received a haircut in the activities room at the SWVC on company time. (ECF No. 123-6 ¶ 16.) Lindsay told Cuthbert and Lowen about the incident. (Id.) According to Mazur, Lowen wanted to fire Warden. (Id.) Lindsay decided not to discipline Warden. (Id.)

that it generated from the DMVA. (ECF No. 129-6 at 58.) Lowen's name is also listed on the document, but he did not know who drafted it. (ECF No. 129-5 at 84.)

A proposal for discipline is not required. (ECF No. 129-10 at 81.) The form used for Warden's proposal for discipline dated June 3, 2016 was "defunct" and not used by the DMVA. (ECF No. 129-10 at 66.) McClain-Miller did not know who drafted Warden's proposal for discipline on the defunct form. (Id.) Warden's proposal for discipline form was incomplete and not properly filled in. (Id. at 68.)

### 3.  Counseling and Oral Reprimand

Warden was initially counseled with respect to her role in the missing $500.00. (ECF No. 129-6 at 60.) On or about June 6, 2016, however, the legal department of the DMVA approved an oral reprimand[13] for Warden with respect to her role in the missing $500.00. (ECF No. 129-1 at 45; ECF No. 123-4 at 8; ECF No. 129-10 at 88.)

### 4.  Discipline Letter

A discipline letter dated July 1, 2016, was addressed to Warden and signed by Cuthbert. (ECF No. 129-1 at 63; ECF No. 123-4 at 16.) The letter constituted "an oral reprimand" to Warden because of her role in the missing $500.00. (Id.) The letter provided that Warden violated the DMVA's Standards of Conduct and Work Rules, "Work Performance, 1. Neglect of Duty; and Use of Property, 2. Loss or damage." (Id.)

On July 1, 2016, Cuthbert emailed McClain-Miller writing: "I thought that it was determined a counseling was being issued [to Warden]." (ECF No. 129-2 at 11.) McClain-Miller responded:

---

[13]     The discipline of an oral reprimand is removed from an employee's personnel file after two years so long as the employee does not commit a similar misstep during that time. (ECF No. 129-9 at 83.)

The direction I was given was that because Ms. Warden was also culpable, that she would receive an Oral Reprimand. I believe Rich had originally thought a counsel session at minimum, but I believe Miss Kim and possibly Legal spoke about it with him and all around the agreed upon level was the OR.

(Id.)

### 5. Mazur Returns to Work and Issues about the Settlement

On June 13, 2016, Mazur returned to work for the SWVC from her suspension without pay. (ECF No. 129-10 at 25.) She refused to sign the final warning letter presented to her by Cuthbert. (Id.; ECF No. 123-4 at 9.) Cuthbert called McClain-Miller to discuss Mazur's refusal to sign the final warning letter. (ECF No. 129-10 at 26.) Mazur had a meeting with Adams upon her return to the SWVC. (ECF No. 129-6 at 11.) Mazur told Adams that the money never left her sight. (ECF No. 129-6 at 25.)

On the same day, Mazur had to reapply for her work identification card and credit card. (ECF No. 94-4 ¶ 17.)

As of June 13, 2016, McClain-Miller and Kreiser took the position that Mazur's case was closed. (ECF No. 129-3 at 51.)

On June 14, 2016, McClain-Miller responded to the emails Mazur sent to Cuthbert on June 1, 2016 and June 14, 2016. (ECF No. 129-1 at 65.) McClain-Miller told Mazur that neither Cuthbert nor she could speak to Mazur about the incident because Mazur was represented by a union. (Id.) McClain-Miller wrote that, in any event, Mazur provided her union representative authority to sign the settlement agreement for time-served and a final warning. (Id.) Mazur was instructed to direct any questions to her union representative, who was carbon-copied on McClain-Miller's email. (Id.)

On the same day, Cuthbert forwarded McClain-Miller's responsive email to Adams and Lowen. (ECF No. 123-4 at 14.) She wrote, in pertinent part:

> [Lindsay] should be notified that union business is not to be handled while the employee is working. He stated that Jane Carr came to his office 3 times today. I find it hard to believe that both were on a break at the same time as they work different shifts. Jane has assigned breaks and lunch….[Mazur] may be working around Jane's break/lunch times but should not be taking additional time for her breaks or lunch. Thank you.

(ECF No. 123-4 at 14.)

On the same day, Mazur emailed or faxed a letter to Ruscavage. (ECF No. 129-2 at 2.) Mazur in the letter wrote that she did not leave the money unattended because the accounting office was locked, she did not leave the accounting office after she placed the money on Warden's chair, she could see Warden's chair from her office, and she verified that Warden entered the office. (Id.) She explained that whether she placed the money on Warden's chair or handed Warden the money, "[t]he outcome…[would have been] the same[.]" (Id. at 3.) Mazur challenged conduct by Kreiser, Cuthbert, and Lowen and the lack of standards and policies in place at the SWVC with respect to handling funds. (Id. at 3-4.)

On June 15, 2016, Ruscavage forwarded Mazur's email to Kreiser, Adams, and Lowen. (ECF No. 129-2 at 2.) Ruscavage wrote:

> I am forwarding this again to you Kim and I copied Rich and Barry. Some questions. Is she returning to work? Did she return to work? Did someone delete her email? What does John Ayers have to do with this? And what does she expect Kim? I feel she is threatening me with arbitration if I do not do something about this whole situation, if she wants to push the issue then let's push right back. She has also sent a fax to my office with basically the same statement and a copy of her last EPR to prove she is a good employee. With her statements and attitude for her peers and supervisor do we really think she is going to come back and be a productive employee?
>
> I am on the road to HVH can I get a call to explain what is now going on.

(ECF No. 129-2 at 2.) Ruscavage testified that his intention in saying "let's push right back" was not to provide an instruction to the employees at the SWVC to harass or retaliate against Mazur. (ECF No. 129-7 at 87.) Ruscavage saying "let's push right back" was in "direct frustration with

feeling threatened by arbitration by Ms. Mazur, and with Ms. Mazur's emails about faxes about her case which he thought to be closed." (ECF No. 123-4 at 18.)

When Mazur was asked during her deposition why individuals at the SWVC were creating a hostile work environment for her, she explained:

> I was fighting really hard to clear my name of wrongful charges. And I contacted everybody in the chain of command – I went up the chain of command and got no answers from anybody through Interrogatories and information that I received, through information I received through the process – the Court process of receiving information from the Defendants.
>
> I received information that…[Ruscavage] had made a statement to management to push back if I was going to push.

(ECF No. 129-3 at 47.) When asked whether Ruscavage's statement that he was going to "push back" against Mazur was motivated by her race, Mazur responded:

> No, it was based on him not approving of me… Since he did not answer me, he wasn't approving of me fighting to clear my record. He wanted to keep it as it was, and basically directing the people under him to push back, if I was going to continue to push to get my record cleared.

(Id. at 48.)

Kreiser sent a reply email to Ruscavage's email sent on June 15, 2016, to McClain-Miller, Richard Murray, Cuthbert, Adams, and Lowen and wrote: "I spoke with Andrew a few minutes ago and told him I will get the answers to his questions and call him back. Didn't we do a pre-grievance settlement?" (Id. at 2.) Attached to Kreiser's email were two pictures[14] of Warden's chair. (Id.)

---

[14]     On June 3, 2016, Lowen took photographs of the accounting office. (ECF No. 129-5 at 53.)

On June 15, 2016, all the folders on Mazur's computer were deleted except one labeled "Stefanie." (ECF No. 129-2 at 35.)

On June 16, 2016, Cuthbert responded to Kreiser's email. (ECF No. 129-2 at 6.) Cuthbert explained:

- there was pre-grievance settlement, which was discussed by McClain-Miller on the telephone with Galuska and Mazur;

- on June 13, 2016, the day on which Mazur returned to work, Cuthbert attempted to hand Mazur the discipline letter, which Mazur refused to sign because "she never agreed" to it;

- Cuthbert informed Mazur to contact her union if she had an issue with the discipline;

- Mazur informed Cuthbert that she had contacted her union but no one responded to her;

- Mazur denied speaking with McClain-Miller on the telephone about the pre-grievance settlement;

- Mazur had "created chaos" every day since she returned to work;

- Lindsay informed Cuthbert that the union representative was in the accounting office three times in one day; and

- Cuthbert asked Adams and Lowen to tell Lindsay that Mazur and the union representative should not be doing union work on company time.

(Id.)

On June 16 and 17, 2016, Mazur was absent for work and took sick leave. (ECF No. 129-5 at 23.) Lowen instructed Lindsay to require Mazur to provide a doctor's note when she was absent and used sick leave. (ECF No. 129-3 at 44.) Lowen, however, did not remember instructing Lindsay to order Mazur to provide a doctor's notes for her sick leave. (ECF No. 129-5 at 10.) Warden in the past had more than two days off and she was not required to provide a doctor's note. (ECF No. 129-3 at 46.)

On June 21, 2016, Mazur spoke with Lindsay and opposed Lowen's requirement that she needed a doctor's note to return to work. (ECF No. 123-6 ¶ 21.) Because of the requirement, Mazur

41

needed to use one day of sick leave to go to the doctor's office and obtain a doctor's note. (Id.) On the same day, Mazur emailed Lowen asking him to "put in writing why…[she] was told to bring a doctor's note for being off of work sick for two days." (ECF No. 123-5 at 8.)

Lowen forwarded Mazur's email to McClain-Miller and Cuthbert. (Id.) Lowen wrote that Mazur "called off sick last thurs [sic] and fri [sic]" and he did not believe she was sick so he instructed Lindsay to require her to provide a doctor's note. (Id.) Lowen explained that he had "no intention of responding to…[Mazur's] demand" for a written explanation of his instructions to Lindsay and that his request for her to provide a doctor's note was based upon "management's contractual right." (Id.)

McClain-Miller responded to Lowen and carbon copied Cuthbert and agreed that "[m]anagement…[had] the right to request a medical for any absences less than three days whenever…[it] had the reason to believe the Employee is abusing sick leave privilege[.]" (Id.) McClain-Miller wrote that she did not "appreciate the tone of…[Mazur's] e-mail" and inquired whether Mazur followed the chain of command[15] to complain about the doctor's note requirement. (Id.) Lowen responded that he believed Mazur did comply with the chain of command rules. (Id.) Lowen responded to an interrogatory, however, that he did not respond to Mazur's email about the requirement of the doctor's note because she did not comply with the chain of command. (ECF No. 123-5 at 9.) Lowen could not remember why he did not believe Mazur was sick on June 16 and 17, 2016. (ECF No. 123-5 at 9.)

On July 12, 2016, Mazur emailed Kreiser requesting that all references to her suspension be "retract[ed] and expunge[d]" because the investigation conducted during her suspension did not reveal evidence of wrongdoing. (ECF No. 129-2 at 13.) Mazur wrote: "Should you fail to do so I

---

[15]       The DMVA had a policy with respect to the chain of command. (ECF No. 123-5 at 11.)

shall take appropriate legal action for libel, slander and violation of Commonwealth policies, procedures, regulations and disciplinary guidelines." (Id.)

Kreiser responded that because a pre-grievance settlement was reached with respect to her case, Kreiser could not provide Mazur the relief she was seeking. (Id.) Kreiser forwarded Mazur's email and her response to Cuthbert and Lowen, stating: "If she becomes disruptive to the work place, please let us know." (Id.)

On July 13, 2016, Mazur responded to Kreiser arguing that the pre-grievance settlement was not "legally enforceable" because Mazur did not sign it. (ECF No. 129-2 at 15.) Mazur wrote: "If you still would like to consider this matter closed, I will see you in court as you acted inappropriately in my suspension. Your and Jennifer's decisions/actions are both substantively and procedurally unconscionable, which makes your settlement unenforceable and lacking legal backing." (Id. at 16.)

On July 14, 2016, Kreiser responded to Mazur's email, writing:

> The agreement outlines the terms that were agreed upon between the union and our office, as acknowledged by John and Jennifer's signatures. Now whether John discussed this with you or not, I do not know. This is a matter between you and the union, not you and our office. As you know, the union represents you during a grievance process. If you haven't done so already, you may want to discuss this with John….The matter is closed on our end.

(ECF No. 123-5 at 15.) Kreiser forwarded her email exchange with Mazur to Ruscavage, Adams, Cuthbert, Murry, McClain-Miller, and Darren Mcnoldy, writing: "Not our problem. Lesson learned, she should have been terminated." (ECF No. 123-5 at 15.) Kreiser later explained that she meant Mazur "should have been terminated" because it was her understanding that if Mazur had not signed the pre-grievance settlement, she would have been fired. (ECF No. 123-5 at 14.)

On August 1, 2016, Mazur wrote to "General Anthony J. Carrelli" ("Carelli") complaining that the investigations performed with respect to the missing $500.00 did not reveal any evidence

of wrongdoing on Mazur's part and requested that her record be cleared and that she be awarded

back pay for her suspension. (ECF No. 129-2 at 18.) In response to Mazur's letter to Carelli, Jerry

Beck asked Kreiser for a response. (Id. at 27.) Kreiser provided a summary of Mazur's case. (Id.)

She wrote, among other things:

> As Mazur was coming out of the office, the co-worker, Sharon Warden was pulling
> the money from the bag and they started to count the money and found that [t]here
> was $500 missing from the $4,784.00.
>
> …
>
> A meeting was held with Chief Counsel, Mike Barrett on June 2nd; Andrew
> Ruscavage; Kim Kreiser, Jennifer McClain-Miller, and via phone Rick Adams,
> Barry Lowen, and Jamie Cuthbert. It was decided that we could not charge anyone
> with theft, but Margaret was ultimately responsible for the money until it was to be
> counted. She left it unattended on Ms. Warden's chair. Although Ms. Warden found
> the money on her chair, she was not ultimately responsible for the money; Ms.
> Mazur placed Ms. Warden in that situation. Ms. Warden was counseled on the
> matter. It was decided to offer a pre-grievance settlement (PGS) for a time-served
> suspension with a final warning.
>
> …
>
> Since Ms. Mazur's return to work, she reached out to numerous entities to have her
> record expunged stating that she never agreed to the PGS and the union shouldn't
> have signed it. It was explained to her on numerous occasions that the matter is
> closed on the DMVA's end. She was directed to contact her union, which she did,
> to address her concern with the union.

(ECF No. 129-2 at 26-27.)

On April 17, 2017, Mazur complained to Adams via a letter slid underneath his door. (ECF

No. 129-3 at 55.) The letter provided, among other things, that Mazur was "dealing with

retaliation" because she filed an EEOC complaint and was being harassed and discriminated

against. (ECF No. 129-6 at 14; ECF No. 129-2 at 63.) Mazur explained:

- Lindsay regularly was yelling at or belittling Mazur, criticizing her work, will not listen
  to her explanations;

- Lindsay received telephone calls from "upper management" inquiring whether Mazur
  violated any work rules;

- Kreiser and McClain-Miller asked Lindsay to "keep an eye" on Mazur;

- Kreiser actively encouraged Cuthbert and McClain-Miller to "trump up a reason to fire" Mazur;

- Kreiser responds to Mazur that the case is closed when Mazur seeks assistance from Kreiser;

- McClain-Miller goes "out of her way to encourage" Cuthbert and Kreiser to have Lindsay harass her in an attempt to force Mazur to quit;

- the tone of McClain-Miller's emails is demeaning;

- McClain-Miller repeatedly responds to Mazur's requests for help that the matter is closed; and

- Lowen has called Mazur a liar and thief in writing.

(ECF No. 129-2 at 64.)

Adams forwarded the letter to Ruscavage. (ECF No. 129-6 at 14.) Adams discussed the letter with Ruscavage in detail. (Id. at 15.) Ruscavage told Adams he would take the letter to the legal department. (Id.)

Mazur described the "harassment"[16] she received upon her return to work: "I was threatened with PDCs constantly [ten times] from…Lindsay when I returned to work." (ECF No.

---

[16]    McClain-Miller explained the protocol for reporting harassment at the SWVC and the DMVA:

> So the obligation is the person to whom the harassment has been reported. Who that person is actually really doesn't matter. It doesn't matter if it's supervisor, if it's a supervisor of supervisors, therefore a manager or a co-worker. When a person reveals that they are being harassed, it is incumbent upon that individual, regardless of their job title to report that.

> We all have to take care of each other. So an employee can't come to you and say, hey, I just want to vent that I'm being harassed. Employees are expected to then take initiative and report that. Now to whom they report it, there are options.

> They can go to a supervisor within their…[chain] of command or outside. They can go directly to a workplace violence coordinator or the EEO coordinator, as is appropriate for the nature of the harassment.

129-3 at 52.) He would close her door and yell at her or stood in front on her door singing

"you're no good, you're no good." (Id.) Lindsay "jokingly" would tell Mazur: "[Y]ou ain't

nobody." (ECF No. 123-6 at 14.) Lindsay continued to tell Mazur "you ain't nobody" after he

said "no more joking." (Id.) Lindsay explained:

> It was just a saying that I brought from North Carolina, that you ain't nobody, and
> we picked and played with each other. That's one of my downfalls as Management.
> I like for my employees to have a good time. I don't want them to feel like they're
> being…so we joke around. We play. We laugh. We sing. And that was a saying
> that we used there.

(Id.)

On April 26, 2017, Adams responded to Mazur, writing: "Margaret I got your letter

discussed it in detail with my boss who passed it on to our legal department." (ECF No. 129-2 at

66.)

On April 27, 2017, Mazur presented a letter of resignation to the SWVC. (ECF NO. 129-3

at 27.)

---

But all employees, regardless of rank or job title, have an obligation to act.
(ECF No. 129-9 at 80.)
An employee reporting harassment in the workplace should start with their chain of
command. (ECF No. 129-7 at 28-29.) The supervisor should speak with the subordinate, take the
information, and appropriate address the allegations through the HR department or management
staff at the veterans' home, e.g., the SWVC. (Id.) An investigation into allegations of harassment
should "most likely" start with the HR department of the veterans' home, e.g., the SWVC. (ECF
No. 129-7 at 29.) Once notified about claims of harassment, the HR department should contact
the "EEO at the DMVA[.]" (ECF No. 129-7 at 30.) Adams described the SWVC's policy on
harassment and discrimination as follows:
> The information is gathered from who feels they're being harassed. It starts
> out in our HR department and moves up through different and various departments
> at Fort Indiantown Gap. Sometimes it's corrected or other times it moves on and
> someone is assigned at the Gap to the investigation.
(ECF No. 129-6 at 49.)
The DMVA had a policy prohibiting, among other things, intimidating behavior and
retaliation towards fellow employees. (ECF No. 123-6 at 19 ¶¶ 1- 3, 7, 10, 12.)

**R.  Mazur's Filings with the EEOC**

On July 2, 2016, Mazur filed her first charge of discrimination with the EEOC. (ECF No. 36 at 6; ECF No. 42 ¶ 1c; ECF No. 129-3 at 48 (Mazur explaining that she filed her first charge of discrimination with the EEOC "shortly after…[she] returned back to work on June 13th, 2016").) A Notice of Charge of Discrimination with a charge number of "533-2016-01239" and date of August 10, 2016, and was addressed to McClain-Miller at the DMVA. (ECF No. 129-2 at 39.)

On September 8, 2016, Mazur filed a second charge of discrimination with the same charge number as her first filing, i.e., "533-2016-01239." (ECF No. 129-2 at 34.) Mazur in the second charge wrote, in pertinent part:

> I believe that I have been discriminated against because of my race, white, and also retaliated against for complaining of unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that, my co-worker (Sharon Warden, race, black) and I handled the money on May 16, 2016. I was suspended without pay and given a final letter while Sharon Warden received no discipline and was reassigned to the Human Resources Office. Also, I was told that I had to bring in a doctor's note for one day of illness. I am not under leave restrictions yet I am being held to a different standard than my co-worker's.

(Id.)  On the charge of discrimination, Mazur indicated the "Earliest" and "Latest" days on which discrimination took place were both "5-26-2016." (Id.) Mazur did not check the box marked "CONTINUING ACTION[.]" (Id.) Mazur described the focus of her first EEOC complaint as follows:

> That I was not given due process. I was treated disparately with a co-worker that was similar situated. That they didn't look at the details of the situation. That they had witness statements that weren't witness statements.
>
> There were no witnesses. So all of it combined, the whole kit and caboodle made it where their actions were not sustainable for the reason that there was no evidence to sustain the charges against me.

(ECF No. 129-3 at 65.)

Mazur did not tell anyone at the SWVC specifically that she filed a complaint with the EEOC. (ECF No. 129-3 at 49.) Mazur told Galuska that she filed an EEOC complaint. (ECF No. 129-3 at 50.) In August 2016, Mazur sent an email to Kreiser telling her that Mazur would "see her in court." (ECF No. 129-3 at 49.)

A Notice of Charge of Discrimination from the EEOC with "EEOC CHARGE NO. 533-2016-01239" was dated October 19, 2016, and was addressed to Stephen J. Bushinski, "Office of Chief Counsel" for the DMVA. (ECF No. 129-2 at 41.) It requested the DMVA to provide a statement position with respect to Mazur's allegations of discrimination and retaliation by November 21, 2016. (Id.)

The DMVA's position statement dated November 17, 2016, provided, among other things, that Mazur in her PDC "admitted that she had left the bag containing the cash unattended on Sharon Warden's desk chair, though she was adamant that the door to the accounting office was closed, and she had listened diligently while in her own office." (ECF No. 129-2 at 44.) The DMVA's position statement also provided:

> In imposing…[the discipline upon Mazur], SWVC considered that Ms. Mazur was the person responsible for safeguarding the funds she withdrew from the bank. It was Ms. Mazur who had gone to the bank and had withdrawn the funds. It was Ms. Mazur's responsibility to ensure that the bank had given her the correct amount of money. If, as Ms. Mazur conjectured at the PDC, the bank manager had stolen the funds, Ms. Mazur would have discovered the crime immediately, while at the bank, if only she made an accurate count of the money.
> …
> As a result of its investigation, SWVC concluded that Ms. Mazur bore the greatest degree of culpability for the missing funds. SWVC also concluded that Sharon Warden bore a very minor degree of culpability, and imposed an oral reprimand on her for her role in the incident.

(ECF No. 129-2 at 44.) On November 25, 2016, Mazur filed a response letter to the DMVA's position statement. (ECF No. 129-2 at 48.) On April 3, 2017, Mazur was advised by the EEOC that it would not be pursuing her case and that she would receive a Notice of Right to Sue. (ECF

No. 129-2 at 59, 61.) A Dismissal and Notice of Rights (a "right to sue" letter) dated April 7, 2017, provided that the EEOC was "unable to conclude that the information obtained establishes violations of the [discrimination] statute[.]" (ECF No. 129-2 at 61.)

On July 12, 2017, Mazur filed a third charge of discrimination with the EEOC. (ECF No. 129-2 at 68.) She wrote that after she filed a charge of discrimination with the EEOC in 2016, she was "subjected to increase scrutiny and treated less favorably than…prior to filing with [the] EEOC." (ECF No. 129-2 at 68.) Mazur explained that she quit her job on April 26, 2017, because she "could not stand the hostile work environment." (Id.) With respect to Lindsay, Mazur explained:

> Darren Lindsay, supervisor, said that if I kept fighting to clear my name I was going to lose everything, including my job. He also told me that Respondent was trying to catch me performing personal business so that I could be fired on the spot. I was yelled at and reprimanded by Darren Lindsay for requesting the security footage to be viewed to determine who entered my office during a fire drill. He also yelled at me three times in one day for asking questions of my co-workers in an attempt to clear my name from the false accusations previously made against me. Darren Lindsay chastised me for informing him that I had a similar issue with Matrix as my co-worker.

(Id. at 69.) Mazur on the charge of discrimination wrote that the discrimination was "CONTINUING" and earliest date of discrimination was June 2, 2016, and the latest date of discrimination was April 19, 2017." (ECF No. 129-2 at 68.)

## IV.    Standard of Review

In relevant part, Rule 56 provides:

A party may move for summary judgment, identifying each claim or defense...on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

...

49

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by…citing to particular parts of materials in the record…or…showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c). After discovery and upon a motion, Rule 56 requires the entry of summary judgment against a party who "'fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322–23)).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts….Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

In deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001). The

court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

In cases involving pro se litigants, the court must liberally construe submissions. Hodson v. Alpine Manor, Inc., 512 F.Supp.2d 373, 384 (W.D. Pa. 2007) (citing Haines v. Kerner, 404 U.S. 519 (1972)). Submissions are read to "raise the strongest arguments suggested therein." Id. (citing Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)). Yet, "a forgiving interpretation does not render immune from dismissal or summary judgment claims that lack procedural or factual viability." Id. In other words, "'the same summary judgment standard applies to pro se litigants.'" Dinnerstein v. Burlington Cty. Coll., No. 113CV5598NLHKMW, 2017 WL 5593776, at *4 (D.N.J. Nov. 21, 2017), aff'd, 764 F. App'x 214 (3d Cir. 2019) (quoting Bank of Nova Scotia v. Ross, No. 2010–118, 2012 WL 4854776, at *3 (D.V.I. Oct. 12, 2012)). "'[B]ald assertions'" unsubstantiated by record evidence will not defeat a well-supported motion for summary judgment. Id. (quoting Rodriguez v. Hahn, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002)).

## V.   Discussion

### A.   The Claims in Dispute

There is rampant confusion[17] in this case about which claims Mazur is asserting against defendants and on which claims the parties seek summary judgment. It is the court's understanding

---

[17]     In the operative complaint, i.e., the first amended complaint, Mazur sets forth the following *five claims*: (1) race discrimination in violation of Title VII; (2) disparate treatment in violation of Title VII; (3) hostile work environment "based on an ongoing pattern of harassment in retaliation for…Mazur having filed the…EEOC case on race and disparate treatment[;]" (4) retaliation in violation of Title VII; and (5) retaliation in violation of § 1981. (ECF No. 36 ¶ I.)
    Mazur in her motion for summary judgment and brief in support of the motion for summary judgment identifies only *three claims* of those five claims for which she is seeking judgment as a matter of law: (1) disparate treatment in violation of Title VII; (2) hostile work environment; and (3) retaliation for opposing defendants' violations of Title VII. (ECF Nos. 121; 122.) Mazur in her material statement of facts, however, asserts "Issue No. 3" as "Due Process Violations of the 5th

that defendants seek summary judgment on all claims in this case. The court based upon its review of the first amended complaint and the parties' summary judgment briefing discerns that Mazur is asserting against defendants, and, seeks summary judgment on, the following six claims: (1) race discrimination in violation of Title VII; (2) disparate treatment in violation of Title VII; (3) hostile work environment; (4) retaliation in violation of Title VII; and (5) retaliation in violation of § 1981; and (6) a claim under 42 U.S.C. § 1983 for violation of her due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

---

and 14th Amendment to the Constitution. (ECF No. 123 at 20.) It appears, therefore, that Mazur is seeking summary judgment on ***four claims.***

 Defendants in their response in opposition to Mazur's motion for summary judgment argue Mazur is not entitled to summary judgment with respect to the following ***four claims***: (1) racial discrimination; (2) disparate treatment; (3) retaliation; and (4) "hostile work environment/constructive discharge." (ECF No. 137.) Defendants collectively address Mazur's retaliation claims under Title VII and § 1981. Defendants' response, therefore, addresses the ***five claims*** set forth by Mazur in the first amended complaint. Defendants in their discussion of Mazur's race discrimination claims, however, also address her attempt to assert a due process claim. (ECF No. 137 at 6-7.)

 Mazur in her reply brief in support of her motion for summary judgment asserts the Due Process Clauses of the Fifth and Fourteenth Amendments as another basis for relief. (ECF No. 140 at 7.)

 Defendants in their brief in support of their motion for summary judgment identify the ***five claims*** asserted in the first amended complaint for which they argue they are entitled to judgment as a matter of law. (ECF No. 127.) Mazur in her response in opposition to defendants' motion for summary judgment identifies ***six claims*** for which the court should deny defendants' judgment as a matter of law: (1) racial discrimination in violation of Title VII; (2) disparate treatment in violation of Title VII;  (3) hostile work environment in violation of Title VII; (4) retaliation in violation of Title VII; (5) retaliation in violation of § 1981; and *(6) constructive discharge*. (ECF No. 135.)

 With respect to Mazur's claim for "constructive discharge," constructive discharge is an adverse employment action for purposes of the discrimination statutes. It is not a standalone claim. In this case, Mazur argues that she suffered a constructive discharge as a result of the harassment she received from defendants upon her return to work. As explained below, Mazur failed to adduce evidence to show that (1) her race was a substantial factor for the harassment, and (2) she engaged in protected conduct under Title VII for which she was retaliated against for the constructive discharge. Under those circumstances, Mazur is not entitled to summary judgment with respect to her hostile work environment or retaliation claims. The court, therefore, need not address whether there is a material fact in dispute about whether defendants' harassment caused Mazur's constructive discharge from the SWVC.

The court below will address each of those six claims and whether Mazur or defendants are entitled to summary judgment with respect to those claims.

### B. Race discrimination in violation of Title VII (count one) and disparate treatment in violation of Title VII (count two)

Mazur acknowledges that her race discrimination claim and her disparate treatment claim are one in the same. (ECF No. 135 at 1 ("Count 1 and 2 go hand in hand as race discrimination was manifested through the disparate treatment that…Lindsay (black) afforded to his white employee….".) The court, therefore, will address those claims as one claim for racial discrimination in the form of disparate treatment in violation of Title VII.

#### 1. General Law

When analyzing Title VII discrimination claims, where no direct evidence of discrimination is presented, courts look to the framework developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The McDonnell Douglas framework calls for a three-step, burden-shifting analysis. The plaintiff has the initial burden to prove by a preponderance of the evidence a prima facie case of discrimination, by satisfying all the elements set forth in McDonnell Douglas. Id. at 802; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981). "The burden of establishing a prima facie case of disparate treatment is not onerous." Burdine, 450 U.S. at 253.

For a plaintiff to establish a prima facie case under Title VII, the plaintiff must satisfy a four-part test. To establish a prima facie case of unlawful employment discrimination in a termination or discipline case, the plaintiff must show: (1) he or she belongs to a protected class; (2) he or she was qualified for the position; (3) he or she was subjected to an adverse employment action, such as termination; and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." Id.

After the plaintiff establishes a prima facie case for discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. For the defendant to carry this burden, the defendant must "clearly set forth" a nondiscriminatory reason. Burdine, 450 U.S. at 255. If the defendant satisfies this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext of discrimination." Id. at 253 (citing McDonnell Douglas, 411 U.S. at 804).

For a plaintiff to satisfy his or her burden to prove that the defendant's legitimate, nondiscriminatory reason is pretext for discrimination, the plaintiff must show "'both that the reason was false, and that discrimination was the real reason.'" Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). To survive a motion for summary judgment, a plaintiff must satisfy at least one of the two prongs formulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id.

### 2.  Mazur's Motion for Summary Judgment

The first element of the prima facie case is that the plaintiff is a member of a protected class, e.g., a racial minority. Mazur alleges, however, that defendants imposed upon her a discipline of suspension without pay of time served and a final warning because she is white, which is not a racial minority. The Third Circuit Court of Appeals recognizes Title VII claims of reverse racial discrimination, i.e., where a person who is not a racial minority is the target of discrimination. Koller v. Riply Riper Hollin & Colagreco, 850 F.Supp.2d 502, 517 (E.D. Pa. 2012)

(citing <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 157-58 (3d Cir. 1999)); <u>Bryson v. City of Wilmington</u>, No. CV 17-133 (JFB/SRF), 2019 WL 181319, at *7 (D. Del. Jan. 11, 2019). A plaintiff alleging a claim of reverse race discrimination under Title VII is not required to prove the first element of the prima facie case, i.e., he or she is a member of a protected class or racial minority. <u>Id.</u> The first prong of the prima facie case is, therefore, not in issue in this case.[18]

The undisputed facts of record show that Mazur satisfies the second prong of the prima facie case, i.e., she is qualified for the position of accounting assistant. On May 16, 2016, Mazur received "outstanding" performance reviews from Lindsay. Defendants do not dispute that Mazur was qualified for her job as an accounting assistant.

With respect to the third element, an adverse employment action is that which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 (3d Cir. 2004). An approximately seven-day suspension without pay and with a final warning is an adverse employment action. <u>Budhun v. Reading Hosp. & Med. Ctr.</u>, 765 F.3d 245, 258 (3d Cir. 2014) (explaining that "adverse employment actions can include suspension without pay") (citing <u>Weston v. Pa.</u>, 251 F.3d 420, 430–31 (3d Cir. 2001)); <u>Hutt v. AbbVie Prod. LLC</u>, 757 F.3d 687, 693 (7th Cir. 2014) (noting that it was "clear" that the plaintiff suffered an adverse employment action "in being placed on formal and final warnings"); <u>Ferrell v. Harvard Indus., Inc.</u>, No. CIV.

---

[18]     The Third Circuit Court of Appeals rejected the invitation to impose an additional burden upon a reverse-discrimination plaintiff to show "background circumstances that support an inference that the defendant employer is 'the unusual employer who discriminates against the majority.'" <u>Iadimarco</u>, 190 F.3d at 155-56 (quoting <u>Wallick v. AT&T Commc'ns, Inc.</u>, Civ. Action No. 87-1007, 1991 WL 635610, at *6 (D.N.J. July 23, 1991)). The Third Circuit Court of Appeals has explained: "all that should be required to establish a prima facie case in the context of 'reverse discrimination' is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." <u>Id.</u> at 161.

A. 00-2707, 2001 WL 1301461, at *10 n.8 (E.D. Pa. Oct. 23, 2001) (noting that under Title VII, the Third Circuit Court of Appeals does not require the adverse employment action to be an "ultimate employment action"). Here, defendants concede that Mazur suffered an adverse employment action; indeed, the undisputed evidence of record shows that on June 8, 2016, as a result of the settlement of the grievance filed by the union, Mazur received a final warning and a suspension without pay of time served (approximately seven days). On June 13, 2016, Mazur returned to work and Cuthbert presented her a discipline letter setting forth the final warning and suspension without pay of time-served, which would remain permanently in Mazur's personnel file. Under those circumstances, the undisputed evidence of record shows that Mazur suffered an adverse employment action.

The fourth prong, i.e., the circumstances of the adverse action give rise to an inference of unlawful discrimination, can be established by showing that, among other things, a similarly situated individual who was not a member of the plaintiff's class, i.e., the plaintiff's comparator, was treated more favorably than the plaintiff. Nguyen v. AK Steel Corp., 735 F.Supp.2d 346, 361 (W.D. Pa. 2010) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir.1999)). Mazur points to Warden as her comparator. (ECF No. 122 at 11.) The evidence of record shows that: (1) Warden identified herself as "White" on an SWVC employment form; (2) Adams described Warden's race as biracial; (3) Kolestar's investigative report, which was based upon Lindsay's statements, identified Warden was black; (4) Lindsay testified that he did not know Warden's race or color; and (5) Mazur considered Warden black. Defendants in their motion for summary

judgment "proceed on the basis" that the undisputed evidence of record shows that Warden was not a member of Mazur's racial class.[19] (ECF No. 127 at 7.)

To be valid comparators, employees need not be "identically situated," but they must be similar in "'all relevant respects.'" Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)). In determining whether employees are similarly situated, the court is required to undertake "a fact-intensive inquiry based on a whole constellation of factors." Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 306 (3d Cir. 2004) (interpreting New Jersey antidiscrimination law). Some of the factors to be considered are whether "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir.2011) (per curiam) (quoting Radue v. Kimberly–Clark Corp., 219 F.3d 612, 617–18 (7th Cir.2000)). The proposed comparators must have engaged in conduct of "comparable seriousness." Nguyen, 735 F Supp.2d at 361 (internal quotation marks omitted). "[S]ummary judgment is appropriate where there is no evidence from which a jury could conclude that the alleged comparators were similarly situated[.]" Corone Reid v. Temple Univ. Hosp. Inc., No. CV 17-2197, 2019 WL 3883550, at *3 (E.D. Pa. Aug. 15, 2019).

---

[19]     The court does not make any factual finding with respect to Warden's racial identity; indeed, "[t]he Court is admittedly ill-equipped to make judgments about whether a certain individual is of a specific race[.]" Toussaint v. NY Dialysis Servs., Inc., 230 F. Supp. 3d 198, 213 (S.D.N.Y.), aff'd, 706 F. App'x 44 (2d Cir. 2017). The court in Toussaint explained that the actual racial identity of the comparator in issue was not material to the case. Id. The relevant inquiry was "what the individuals involved in the decision to terminate knew or believed." Id. Viewing the evidence in the light most favorable to Mazur, there is a reasonable inference that at least some of the supervisors believed Warden was black.

Here, the undisputed evidence of record shows that Mazur and Warden were both supervised by Lindsay, and Mazur and Warden were subject to the same work rules. Those facts support a finding that Mazur and Warden were similarly situated. The undisputed evidence of record, however, also shows that Mazur's discipline of a suspension without pay and a final warning was issued pursuant to the settlement agreement entered into by McClain-Miller (on behalf of defendants) and Galuska (as a representative of the union on behalf of Mazur) with respect to the grievance dated June 1, 2016. While Mazur disputes that she agreed to the settlement, the evidence of record is undisputed that the *union* agreed to the settlement on her behalf.

There is no evidence of record to show that at the time the settlement was entered into *defendants* knew or should have known that the grievance or settlement was entered into improperly on Mazur's behalf. To the contrary, Ruscavage testified that he was "not aware that…[Mazur] were [sic] not in line with…[the union] or any of that." (ECF No. 129-7 at 61.) Mazur argues that the grievance dated June 1, 2016, did not contain her signature. The form, however, provides space for the union steward's signature "and/or" the employee's signature. There is no evidence of record upon which a reasonable jury could find that at the time the settlement was entered into defendants knew or had reason to know the settlement was improper or not made with Mazur's consent because it did not contain Mazur's signature. A reasonable jury could only find that Mazur's discipline was imposed pursuant to the grievance settlement. There is no evidence of record to show that Warden or the union on her behalf filed a grievance or entered into a settlement agreement with defendants with respect to her oral reprimand. Under those circumstances, Mazur did not adduce evidence upon which a reasonable jury could find that Warden and she were similarly situated with respect to the discipline they received for their roles in the missing $500.00.

Based upon the foregoing, the undisputed evidence of record shows that Mazur is not similarly situated to Warden in all relevant respects because Mazur's discipline was not the result of independent action by defendants; rather, the undisputed evidence shows that Mazur's discipline was the result of a settlement between defendants and Galuska, who was acting as a union representative upon Mazur's behalf. There is no evidence of record that Warden's discipline was also the result of a settlement with the union.

Mazur did not point to any other evidence of record to raise an inference that she was disciplined to a suspension without pay and a final warning because she is white. In other words, the undisputed evidence of record, viewed in the light most favorable to Mazur, shows that she cannot prove a prima facie case of race discrimination.[20] Mazur's motion for summary judgment with respect to this claim will, therefore, be denied.

### 3. Defendants' Motion for Summary Judgment

As explained above, counts one and two are the same claim and are based upon Mazur's allegations that defendants treated her less favorably than her black coworker (Warden) because she is white. Mazur, however, did not adduce evidence upon which a jury could find that Mazur received disparate treatment because she is white. The undisputed evidence of record shows that Mazur received discipline of a suspension without pay and a final warning pursuant to the

---

[20]     Even if Mazur could satisfy her burden with respect to the prima facie case of discrimination, the settlement agreement entered into between McClain-Miller and Galuska is a legitimate, nondiscriminatory reason that Mazur received discipline of suspension without pay and a final warning. As discussed above, Mazur did not present any evidence upon which a reasonable jury could find that defendants had any reason to believe that the grievance filed on June 1, 2016, or Galuska's negotiations with McClain-Miller were not asserted properly on Mazur's behalf. Under those circumstances, Mazur could not satisfy her burden to adduce evidence that the negotiated settlement agreement was pretext for race discrimination. Mazur's motion for summary with respect to her discrimination claim would, therefore, be denied on that basis and defendants' motion for summary judgment with respect to that claim would be granted.

agreement Galuska, on behalf of the union (which represented Mazur), entered into with McClain-Miller, on behalf of defendants. Mazur did not adduce any evidence to show that Warden's discipline was imposed as a result of a similar union grievance and settlement. Under those circumstances, Mazur did not adduce evidence to show that her discipline was received in circumstances that give rise to an inference of unlawful race discrimination. Defendants, therefore, are entitled to summary judgment with respect to counts one and two. Their motion for summary judgment will be granted with respect to those counts.

### C. Hostile Work Environment in Violation of Title VII

The basis for Mazur's hostile work environment claim is unclear. In the first amended complaint (ECF No. 36 at 1), Mazur's amended brief in support of her motion for summary judgment (ECF No. 132 ¶¶ 62-66), her reply brief in support of her motion for summary judgment (ECF No. 140 at 6), her statement of material facts (ECF No. 142 ¶¶ 290, 384), and in response to defendant's statement of material facts (ECF No. 143 ¶ 38), she complains that defendants created a hostile work environment because she opposed their illegal practices with respect to her role in the missing $500.00. In other words, Mazur alleges that defendants created a hostile work environment in retaliation to her engaging in protected activity under Title VII. In Mazur's response in opposition to defendants' motion for summary judgment,[21] however, she argues she set forth evidence to support a reasonable jury finding that Lindsay created a hostile work environment because she is white. (ECF No. 135 at 20-22.) Mazur did not include in her motion

---

[21]    Even in Mazur's response in opposition to defendants' motion for summary judgment, however, she is unclear about the basis for her hostile work environment claim:

> Based on…Mazur's above rebuttals…the record is replete with examples of **race discrimination/retaliation** and **her opposing Defendants' illegal acts** and failing to follow their own zero tolerance **policies** on harassment/bullying and discrimination.

(ECF No. 135 ¶ 39 (emphasis added).)

for summary judgment a request for summary judgment with respect to a hostile work environment claim based upon her race, as opposed to a retaliation claim based upon a protected activity. The court, therefore, will analyze only whether defendants are entitled to summary judgment on a hostile work environment claim based upon Mazur's race, i.e., the court will view the evidence in the light most favorable to defendants to determine whether there are material disputes of fact about whether Mazur's race was a substantial factor in Lindsay creating a hostile work environment for Mazur.[22] In parts D and E of this opinion, the court will address fully Mazur's request for summary judgment with respect to her claims for retaliation based upon protected activity under Title VII and § 1981.

### 1. General Law

Title VII prohibits racial or sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986); see AMTRAK v. Morgan, 536 U.S. 101, 116 n. 10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standards as those based on sexual harassment."). To succeed on a hostile work environment claim, the plaintiff must establish that: (1) the employee suffered intentional discrimination because of his or her protected status; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat

---

[22]     As discussed below, Mazur did not adduce evidence upon which a reasonable jury could find that she proved the elements of a hostile work environment claim (as compared to a claim of retaliation based upon harassing conduct). Under those circumstances, even if the court found Mazur's motion for summary judgment included a request for summary judgment on a hostile work environment claim that is separate from her claims of retaliation, any motion for summary judgment by Mazur with respect to the hostile work environment claim would be denied. Mazur would not be entitled to judgment as a matter of law with respect that claim.

superior liability. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). The first four elements establish a prima facie hostile work environment case, and the fifth element establishes employer liability. Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009).

### a. The employee suffered intentional discrimination because of his or her protected status

"Title VII protects only against harassment based on discrimination against a protected class; it is not 'a general civility code for the American workplace.'" Mufti v. Aarsand & Co., 667 F. Supp. 2d 535, 544 (W.D. Pa. 2009) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80–81 (1998)). The first element of a hostile work environment claim, therefore, requires the plaintiff to prove that the defendant's harassing "conduct was motivated by animus based on [his or] her race." Id. At the summary judgment stage of proceedings, "[t]he proper inquiry…[is] whether a reasonable factfinder could view the evidence as showing that …[the plaintiff's] treatment was attributable to [his or her protected status]." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 277 (3d Cir. 2001). "'The critical issue, Title VII's text indicates, is whether members of one sex [or race] are exposed to disadvantageous terms or conditions of employment to which members of the other sex [or race] are not exposed.'" Ogden v. Keystone Residence, 226 F.Supp.2d 588, 598 (M.D. Pa. 2002) (quoting Oncale, 523 U.S. at 81).

The plaintiff's task in this regard is less onerous when the harasser's statements to the plaintiff refer to the plaintiff's protected status. Id.; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996). For example, "[a] trier of fact might reasonably find [sex] discrimination…if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Oncale, 523 U.S. at 80. "[O]vert racial harassment[,]" however, "is

not necessary to establish a hostile environment" in a race discrimination case. <u>Aman</u>, 85 F.3d at 1083. The plaintiff is not required to produce "direct evidence" of the defendant's "intentional discrimination" based upon his or her protected status or to "peer inside the harasser's mind." <u>Abramson</u>, 260 F.3d at 278. A plaintiff may satisfy his or her burden with respect to the first element of a hostile work environment claim if he or she presents "sufficient evidence to give rise to an inference of discrimination[.]" <u>Id.</u> at 278-79. In other words, "[a]ll that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had…[not been a member of his or her protected class, he or] she would not have been treated in the same manner." <u>Aman</u>, 85 F.3d at 1083. A plaintiff may satisfy his or her burden in this regard by adducing evidence that his or her similarly situated coworkers, who were not members of his or her race, received preferential treatment. <u>Moody v. InTown Suites</u>, No. 1:04-CV-1198-TWT-AJB, 2006 WL 8431638, at *33 (N.D. Ga. Feb. 1, 2006) (recognizing that allegations that "similar" employees who were not members of the plaintiff's race received preferential treatment may be sufficient to show plausibly that the plaintiff was subject to a hostile work environment because of his or her race).

### b.  The discrimination was severe or pervasive

To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 168 (3d Cir. 2013) (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993); <u>Caver v. City of Trenton</u>, 420 F.3d 243, 262–63 (3d Cir. 2005)). The Supreme Court of the United States has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of

employment." Faragher v. Boca Raton, 524 U.S. 775, 788 (1998). To survive summary judgment, a plaintiff must present some evidence that the workplace was permeated with discriminatory intimidation, ridicule, or insult that was so severe or pervasive that it altered the conditions of employment and created an abusive working environment. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); Abramson, 260 F.3d at 278–79 (citing Harris, 510 U.S. at 21).

      **c.**  **The discrimination detrimentally affected the plaintiff and the discrimination would detrimentally affect a reasonable person in like circumstances**

A claim for hostile work environment encompasses both objective and subjective elements. Spain v. Gallegos, 26 F.3d 439, 447 (3d Cir. 1994); Toth v. Cal. Univ. of Pa., 844 F. Supp. 2d 611, 627 (W.D. Pa. 2012). The Supreme Court of the United States has explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

> But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993).

      **d.**  **The existence of respondeat superior liability**

In determining if respondeat superior liability exists, the court must distinguish between whether it was a supervisor or a co-worker who allegedly caused the hostile work environment. The Supreme Court of the United States has explained:

> Under Title VII, an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Id., at 807, 118 S.Ct. 2275; Ellerth, supra, at 765, 118 S.Ct. 2257. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

Vance v. Ball State Univ., 570 U.S. 421, 424 (2013).

The Court in Vance explained that an "employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." Id. A "tangible employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). In other words, employers provide supervisors the authority to "'make economic decisions affecting other employees under his or her control.'" Id. (quoting Ellerth, 524 U.S. at 761); Moody v. Atl. City Bd. of Educ., 870 F.3d 206, 216 (3d Cir. 2017) (recognizing that the authority to assign work, which impacts an employee's hourly earnings, is a tangible employment action giving rise to a supervisor classification). "The ability to direct another employee's tasks is simply not sufficient." Id. at 439.

### 2.   Defendant's Motion for Summary Judgment

There are two periods of time relevant to Mazur's hostile work environment claim: (1) the time period prior to May 26, 2016, during which Mazur and Warden worked as accounting assistants under Lindsay; and (2) the period after Mazur returned to work and during which Warden worked in the HR department under Cuthbert. With respect to the first element of a hostile

work environment claim, i.e., whether the plaintiff was subjected to intentional discrimination based upon his or her race, Mazur attempts to prove that Lindsay subjected her to severe and pervasive harassment because she was white with evidence that Lindsay provided preferential treatment to her similarly situated black coworker, i.e., Warden. (ECF No. 135 ¶ 34.) Mazur adduced evidence upon which a reasonable jury could find that during the first period of time, i.e., prior to May 26, 2016, Lindsay supervised Mazur and Warden, who were both accounting assistants. A reasonable jury could, therefore, conclude that prior to May 26, 2016, Mazur and Warden were similarly situated with respect to Lindsay. The evidence adduced by Mazur with respect to the time period during which Mazur and Warden were both supervised by Lindsay in the accounting department, however, does not support a reasonable jury finding that the harassment experienced by Mazur during that period of time was severe and pervasive.

Mazur adduced evidence that while Warden and she were accounting assistants, Lindsay and Warden talked about the "hood" and other things Mazur did not understand, Lindsay and Warden treated her with disdain because she did not fit in, and Mazur would have to fill-in for Warden when she took her excessive breaks. Mazur also adduced evidence to show that Lindsay did not discipline Warden for taking excessive breaks, leaving the bank window and cash box unattended, failing to perform turnover counts of money, and for a $90.00 shortage in resident withdrawal funds.[23] The foregoing evidence, however, does not support a reasonable jury finding that Mazur was subjected to severe and pervasive harassment that created a hostile working environment and, thus, was sufficiently "extreme" to constitute an alteration in the terms of

---

[23]     The evidence of record also shows that during Mazur's suspension, Lindsay did not discipline Warden when she received a haircut during work hours. Because Mazur was suspended during that period of time, she and Warden were not similarly situated during that time.

66

Mazur's employment. Faragher, 524 U.S. at 788. As discussed above, Title VII is not a "general civility code[,]" and, therefore, Lindsay's conduct toward Mazur is not sufficient to create a material dispute of fact about whether he subjected her to severe and pervasive harassment during the period of time in which Mazur and Warden were similarly situated. In other words, a reasonable jury could not find that Lindsay subjected Mazur to severe and pervasive harassment prior to her suspension.

With respect to the second period of time, i.e., the time following Mazur's return to the SWVC on June 13, 2016, Mazur does not point to any evidence of record to show that her race was a substantial factor for Lindsay's harassing conduct. When Mazur returned to the SWVC, Warden worked in the HR department under Cuthbert. At that point in time, Mazur and Warden did not share a supervisor or job title, and, therefore, were no longer similarly situated to support an inference of discrimination. See Blake v. Potter, No. 03 CIV. 7733(LAP), 2007 WL 2815637, at *7 (S.D.N.Y. Sept. 25, 2007), aff'd, 330 F. App'x 232 (2d Cir. 2009) ("Plaintiff and her co-employee were no longer similarly situated. Thus, a reasonable fact-finder cannot conclude that any difference in treatment at that point was the result of discrimination."). Mazur does not point to any other evidence of record to suggest that Lindsay's conduct following her return to the SWVC was brought about because of her race. Mazur adduced evidence to show that Lindsay:

- threatened her with a PDC, which likely would lead to her termination, at least ten times;

- closed her office door and yelled at her;

- sang to her "you're no good, you're no good" (ECF No. 129-3 at 52);

- told her "you ain't nobody" (ECF No. 123-6 at 14); and

- regularly belittled her, overly criticized her her work, and refused to listen to her explanations.

The foregoing evidence, however, does not constitute direct evidence of Lindsay's racial discriminatory animus or evidence from which a reasonable inference of race discrimination may be drawn. Under those circumstances, Mazur did not adduce any evidence to show that her race was a substantial factor behind Lindsay's harassing conduct. Thus, a reasonable jury could not find that Mazur proved the second element of a hostile work environment claim. Defendants are, therefore, entitled to summary judgment with respect to a claim of hostile work environment. Defendants' motion for summary judgment will be granted with respect to that claim.

### D.  Retaliation in violation of Title VII (count four)

#### 1.  General Law

The elements of a Title VII claim of retaliation are: (1) the plaintiff engaged in activity protected by Title VII; (2) the defendant took an adverse employment action against the plaintiff; and (3) there was a causal link between the plaintiff's participation in the protected activity and the defendant's adverse employment action. Moore v. Phila., 461 F.3d 331, 340 (3d Cir. 2006) (citing Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir.1995)). The plaintiff must prove that his or her protected activity was the but-for cause of the adverse employment action. Moore v. Sec'y United States Dep't of Homeland Sec., 717 F. App'x 179, 185 (3d Cir. 2017) (citing Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013)).

#### 2.  Mazur's Motion for Summary Judgment

With respect to the first element, i.e., the plaintiff engaged in protected activity, "the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Moore, 461 F.3d at 341. "'Opposition' to discrimination can take the form of 'informal protests of discriminatory employment practices, including making complaints to

management'. To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, 'we look to the message being conveyed rather than the means of conveyance'." Id. at 343 (quoting Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)). "Complaints [of discriminatory employment practices] must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice." Caplan v. L Brands/Victoria's Secret Stores, LLC, 210 F. Supp. 3d 744, 754 (W.D. Pa. 2016) (citing Sanchez v. SunGard Availability Services LP, 362 F. App'x 283, 288 (3d Cir. 2010)); see Abramson, 260 F.3d at 288 (concluding complaints by plaintiff to defendant, whether oral or written, formal or informal, are sufficient to satisfy the first prong of a retaliation claim, provided the complaints expressed plaintiff's opposition to a protected activity under Title VII). The plaintiff's opposition "must not be equivocal." Moore, 461 F.3d at 341 (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)).

This court previously granted defendants' motion to dismiss Mazur's retaliation claim that was based upon Mazur's protected activity of filing her first charge of discrimination with the EEOC on July 2, 2016. (ECF No. 96 at 29-30.) The court explained that Mazur in the first amended complaint and in the proposed second amended complaint did not set forth sufficient factual allegations to show plausibly a causal connection between the filing of the first charge of discrimination with the EEOC, of which defendants received notice no earlier than August 10, 2016, and defendants' alleged adverse employment actions. (Id. at 30-32; ECF No. 117 at 5.) Defendants in their motion to dismiss that retaliation claim did not raise any argument about Mazur's retaliation claims based upon other alleged protected activity. Under those circumstances, Mazur's Title VII and § 1981 retaliation claims based upon protected activity other than filing the first charge of discrimination with the EEOC remained in the case; indeed, Mazur and defendants

each request summary judgment on those claims. For Mazur to be entitled to summary judgment

on her Title VII or § 1981 retaliation claims, the undisputed evidence of record must show that she

engaged in a protected activity other than filing her first charge of discrimination with the EEOC

and a causal connection between that activity and defendants' alleged adverse employment action.

Prior to August 10, 2016, Mazur sent letters, emails, and facsimiles to her superiors at the

SWVC and the DMVA in which she sought to have her "record cleared[,]" (ECF No. 129-3 at 48),

and argued that she was suspended while Warden was still at work, (ECF No. 129-1 at 66). Mazur

during her deposition in this case expressed that she complained to Cuthbert and Kreiser via email

about the "disparate treatment" she received with respect to her role in the missing $500.00. (ECF

No. 129-3 at 48-50.) A review of Mazur's email to Cuthbert dated June 1, 2016, and Mazur's

emails to Kreiser dated July 12, 2016, and July 13, 2016, however, show that Mazur did not place

defendants on notice that she opposed their practices of racial discrimination in violation of Title

VII. In Mazur's email to Cuthbert dated June 1, 2016, Mazur wrote, among other things:

> It is clear that there is not a fair investigation going on as I am suspended without
> pay and Sharon is still at work. I made one mistake of not handing the bag of money
> directly to Sharon when she walked in the door, now my world is turned upside
> down. You are barking up the wrong tree pinning the theft on me.

(ECF No. 129-1 at 66.) In Mazur's email to Kreiser dated June 12, 2016, Mazur wrote, among

other things, that there was no evidence to support the charges sustained against her, and she

requested Kreiser to clear her record and provide her backpay. (ECF No. 129-2 at 13.) Mazur

wrote: "Should you fail to do so I will take appropriate legal action for libel, slander and

violation of Commonwealth policies, procedures, regulations and disciplinary guidelines." (Id.)

In Mazur's email to Kreiser dated July 13, 2016, she wrote, among other things, that she did not

sign-off on the union's settlement because the written agreement did not correspond to her

understanding of the verbal agreement. (ECF No. 129-2 at 16.) Mazur also wrote:

> If you still would like to consider this matter closed, I will see you in court as you acted inappropriately in my suspension. Your and Jennifer's decisions/actions are both substantively and procedurally unconscionable, which makes your settlement unenforceable and lacking legal backing.

(ECF No. 129-2 at 16.) The foregoing communication shows that Mazur was unhappy with how she was treated by defendants with respect to her role in the missing $500.00. It also shows that Mazur believed Warden received preferential or different treatment with respect to Warden's role in the missing $500.00. Those emails predate August 10, 2016, and do not provide defendants notice that Mazur believed defendants' actions toward her prior to that date were based upon her race.

In Barber, the plaintiff sued his employer for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), and gender discrimination under Title VII. He asserted under each statute claims of discrimination for failure to promote and retaliation for filing his discrimination claim. Barber, 68 F.3d at 696. The claims for gender discrimination were tried to the court, which found for the defendant-employer. Id. at 697. The age discrimination claims were tried to a jury, which found in the plaintiff's favor. Id. Following the jury trial, the defendant-employer filed a motion for judgment notwithstanding the verdict on the age discrimination claims, which the court granted. Id. Relevant to this case, the district court found that the plaintiff did not prove that he engaged in conduct protected under the ADEA, which was fatal to his retaliation claim. Barber, 68 F.3d at 701-02. The plaintiff appealed the district court's decision with respect to the age discrimination claims to the Third Circuit Court of Appeals. Id.

The evidence of record showed that after the plaintiff learned he did not receive the promotion in issue, he wrote a letter to the defendant-employer's human resources department to complain that he did not receive the promotion. Id. The letter, in pertinent part, provided:

I recently submitted a Job Application Form for the position of Territorial Account Executive (Job Vacancy No. 199) at Pittsburgh, PA.

Mr. Robert W. Edmonds, Jr., Director–Sales, Pittsburgh, has informed me the position has been awarded to Ms. Kathy Ball from Telemarketing at Baltimore. In view of my 21 years of experience in this field (14 years direct sales and 7 years customer service), I am quite puzzled as to why the position was awarded to a less qualified individual.

I would greatly appreciate your response as to why I was not awarded this job.

Barber, 68 F.3d at 697. The Third Circuit Court of Appeals rejected the plaintiff's argument that the foregoing letter constituted protected conduct under the ADEA. Id. at 701-02. The court explained that while the plaintiff in the letter "complains about the unfair treatment in general and expresses his dissatisfaction with the fact that someone else was awarded the position…it does not specifically complain about age discrimination." Id. Under those circumstances, the letter did not "constitute the requisite 'protected conduct for a *prima facie* case of retaliation.'" Id. at 702.

The court of appeals explained:

Barber's letter is just too vague to support a finding that his job was eliminated because he engaged in behavior that was protected under the ADEA. A person has engaged in "protected conduct" when s/he "has opposed any practice made unlawful by ... section [623]." 29 U.S.C. § 623(d). The practice made unlawful by § 623 is "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age." 29 U.S.C. § 623(a). Thus, the statute provides that a person has engaged in "protected conduct" when s/he opposes discrimination on the basis of age.

It is clear from Barber's letter that he felt that he had been treated unfairly as he stated that "the position was awarded to a less qualified individual." However, that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness. A general complaint of unfair treatment does not translate into a charge of illegal age discrimination. The jury was not presented with any evidence to support its conclusion that Barber's position was eliminated because he engaged in protected activity. Accordingly, the district court properly granted the defendants' motion for judgment as a matter of law on that portion of Barber's claim.

Barber, 68 F.3d at 702.

Here, the undisputed evidence of record shows that Mazur—in an effort to clear her record—prior to August 10, 2016, repeatedly complained to her superiors at the SWVC and the DMVA about, among other things, the investigation (or lack thereof) of the missing $500.00, the insufficient standards and procedures of the SWVC and the DMVA, the lack of evidence against her, and receiving a punishment more severe than the punishment imposed upon Warden. Mazur's communications to her superiors at the SWVC and the DMVA prior to August 10, 2016 are akin to the letter sent by the plaintiff in Barber to his human resources office. While Mazur complains that she was unfairly treated, her communications do not "explicitly or implicitly allege that…[race] was the reason for the alleged unfairness[.]" Barber, 68 F.3d at 702. In other words, there is no evidence of record upon which a reasonable jury could find that prior to August 10, 2016, Mazur expressed to anyone at the SWVC or the DMVA that she believed she was blamed for the missing $500.00 and received a more severe punishment than Warden because of her race or that she otherwise engaged in protected activity under Title VII. Id.; see Hibbard v. Penn-Trafford Sch. Dist., No. CIV.A. 13-622, 2014 WL 640253, at *17 (W.D. Pa. Feb. 19, 2014) (finding the plaintiff's allegations that she complained about unfair treatment were too vague to constitute protected activity under Title VII); Robuck v. Mine Safety Appliances Co., No. 2:10-CV-00763, 2010 WL 4553562, at *5 (W.D. Pa. Nov. 3, 2010) (finding the plaintiff's complaints that a female coworker received priority over him were insufficient to constitute protected activity under Title VII); DeJoy v. Comcast Cable Commc'ns Inc., 968 F. Supp. 963, 988 (D.N.J. 1997) (finding the plaintiff's protests about his removal from his position after he suffered an aortic aneurysm were too vague to constitute protected activity under the ADEA and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.).

As discussed above, Mazur did not express to any of her superiors prior to August 10, 2016, that she believed she was blamed for the missing $500.00 and received a suspension without pay and a final warning *because she is white*. In other words, a reasonable jury could not find that prior to August 10, 2016, Mazur engaged in protected activity by opposing defendants' conduct in violation of Title VII.

The evidence of record shows that after August 10, 2016, and while employed by the SWVC, Mazur—in addition to the filing of her first EEOC complaint—engaged in one other protected activity, i.e., she slid a letter dated April 17, 2017 underneath Adams' door. In that letter, Mazur informed Adams that Lindsay, Kreiser, McClain-Miller, and Lowen retaliated against her for filing an EEOC complaint. (ECF No. 129-2 at 63-64.) With respect to that protected activity, however, Mazur did not adduce evidence of record to show she could prove the third element of a retaliation claim, i.e., causation. Ross v. Gilhuly, 755 F.3d 185, 194 (3d Cir. 2014) ("An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative evaluations *before* engaging in the protected activity.") (citing Shaner v. Synthes, 204 F.3d 494, 504-05 (3d Cir. 2000)) (emphasis added); Janowski v. Sage Client 441, LLC, No. CIV.A. 12-986, 2013 WL 264904, at *4 (W.D. Pa. Jan. 4, 2013) ("If the adverse employment action takes place before the protected activity, the court cannot find the requisite causal connection exists to state a claim for retaliation under Title VII…."); Koteles v. ATM Corp. of Am., No. CIV.A. 05-1061, 2008 WL 4412098, at *17 (W.D. Pa. Sept. 23, 2008) ("Because plaintiff's complaint to her supervisor was made four months after she was denied the position and she did not file her complaint with the EEOC until four months after she complained to her supervisor, no causal connection can be drawn that plaintiff's failure to obtain the position, which predated her activities, was somehow retaliatory for any of her protected

activities."). She makes no showing that she suffered harassment between April 17, 2017, and April 27, 2017 (the date of her resignation) because she gave the letter dated April 17, 2017, to Adams. A reasonable jury, therefore, could not find that defendants harassed her because she engaged in protected activity under Title VII by complaining to Adams about retaliation on April 17, 2017.

Based upon the foregoing, Mazur did not adduce evidence to show that prior to August 10, 2016, she engaged in protected activity under Title VII. No earlier than August 10, 2016, defendants were notified that Mazur filed her first charge of discrimination, which—because that claim was dismissed for insufficient factual allegations to plausibly show a causal connection with any adverse employment action—cannot form the basis of her retaliation claims.[24] While Mazur adduced evidence to show that she engaged in protected activity via the letter to Adams dated April 17, 2017, she did not adduce any evidence to show a causal connection between that activity and any of defendants' adverse employment actions, i.e., she suffered harassment because she complained about retaliation in that letter. Mazur's motion for summary judgment with respect to her Title VII retaliation claim will, therefore, be denied.

### 3. Defendants' Motion for Summary Judgment

Mazur did not adduce evidence upon which a reasonable jury could find that prior to August 10, 2016, she engaged in protected activity other than filing her first charge of discrimination. As explained above, while Mazur prior to August 10, 2016 complained about receiving unfair treatment with respect to her role in the missing $500.00, she did not implicitly or

---

[24]   There was no evidence of record adduced in Mazur's motion for summary judgment to cause the court to reconsider that decision, i.e., Mazur failed to adduce evidence of a causal connection between the filing with the EEOC of the first charge of discrimination and any of defendants' alleged adverse employment actions.

explicitly complain to defendants about race discrimination. While Mazur engaged in protected activity by filing the first EEOC charge, as discussed above, any retaliation claims based upon that protected activity were previously dismissed. Mazur again engaged in protected conduct by complaining to Adams via a letter dated April 17, 2017 that she was suffering harassment because she filed her EEOC complaint, but she did not adduce evidence of the third element of that claim, i.e., causation. Specifically, there was no evidence of harassment after that date and no reasonable jury could find that the protected activity caused any retaliatory conduct. Mazur, therefore, could not prove her Title VII retaliation claims at trial. Defendants' motion for summary judgement will, therefore, be granted with respect to these claims and judgment will be entered in their favor.

### E.  Retaliation in violation of § 1981 (count five)

#### 1.  Mazur's Motion for Summary Judgment

The Third Circuit Court of Appeals has recognized that § 1981 does not provide a private right of action against state actors; rather, the proper recourse is under 42 U.S.C. § 1983. McGovern v. City of Phila., 554 F.3d 114, 120 (3d Cir. 2009). In other words, "'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" Id. (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)). Defendants are state actors, and, therefore, Mazur is not entitled to relief from them under § 1981. Mazur's motion for summary judgment with respect to her § 1981 retaliation claim will, therefore, be denied on that basis.

Even if Mazur in the first amended complaint properly asserted a § 1983 claim for retaliation, her request for summary judgment on that claim would be denied. First, under § 1983, Mazur "must show a deprivation of a 'right secured by the Constitution and the laws of the United States ... by a *person* acting under color of state law.'" Krause v. Pa. Dep't of Military & Veterans

Affairs, No. 1:11-CV-1080, 2011 WL 6742519, at *3 (M.D. Pa. Dec. 22, 2011); Lewis v. State of Del. Dep't of Pub. Instruction, 948 F. Supp. 352, 365 (D. Del. 1996). Defendants, as agencies of Pennsylvania, are not "persons" under § 1983. Id.; (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  Mazur, therefore, cannot state a cognizable § 1983 claim against defendants for depriving her of her § 1981 rights.

In any event, the analysis of a retaliation claim brought pursuant to Title VII and the analysis of a retaliation claim brought pursuant to § 1983 are identical. Thomas v. Wheeler, No. 05-CV-1447, 2006 WL 8450235, at *15 (E.D. Pa. Apr. 10, 2006) (citing Zappan v. Pa. Bd. of Prob. and Parole, 152 F. App'x 211, 217 (3d Cir. 2005)); McKenna v. Phila., 304 F. App'x 89, 92 (3d Cir. 2008)). As discussed above, Mazur did not adduce evidence sufficient for a reasonable jury to find in her favor on a retaliation claim under Title VII. For these reasons, if Mazur could assert a § 1983 claim against defendants, she would not be entitled to judgment as a matter of law on her § 1983 retaliation claim, and her motion for summary judgment would be denied.

### 2.  Defendant's Motion for Summary Judgment

As discussed above, Mazur cannot state a cognizable claim for relief under § 1981 against defendants because they are state actors and § 1981 does not provide a private remedy against state actors. Even if Mazur properly asserted a § 1983 retaliation claim against defendants, they would be entitled to summary judgment with respect to that claim because defendants are not persons who can be sued under § 1983. In any event, Mazur did not adduce evidence upon which a reasonable jury could find that she satisfied the first element of that kind of claim, i.e., she engaged in protected conduct (other than filing her first EEOC charge, which for reasons set forth in the court's opinion dated August 17, 2018 (ECF No. 96) cannot form the basis of her claim). With respect to the April 17, 2017 letter, she did not adduce sufficient evidence of the third element of

that kind of claim, i.e., causation. Defendants are, therefore, entitled to summary judgment with respect to this claim and their motion for summary judgment will be granted.

### F.  Fifth and Fourteenth Amendments Due Process Claim

Claims based upon violations of rights guaranteed by the United States Constitution by state actors are properly raised under 42 U.S.C. § 1983. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). It is unclear from the allegations in the first amended complaint whether Mazur intended to set forth a § 1983 claim based upon defendants violating her constitutional rights; indeed, Mazur in her motion for summary judgment and brief in support of the motion does not seek judgment as a matter of law on a § 1983 claim. Mazur, however, raises due process issues in her first amended complaint and in her statement of material facts by arguing that defendants did not afford her due process in their investigation of her role in the missing $500.00 because they did not provide her the evidence upon which they sustained the charges against her. It appears that Mazur raises these arguments to show that defendants' reasons for disciplining her were pretext for discrimination.  As discussed above, however, Mazur is not entitled to relief from defendants under § 1983 because they are not "persons" under the statute. Krause, 2011 WL 6742519, at *3; Lewis, 948 F. Supp. at 365. Mazur, therefore, cannot state a cognizable § 1983 claim against defendants for depriving her of her constitutional rights.[25]

In any event, "the Eleventh Amendment prohibits federal courts from hearing suits by private parties against States and their agencies." Krause, 2011 WL 6742519, at *2. Defendants

---

[25]     For the same reasons, Mazur is not entitled to the relief she requests in her motion to compel a name-clearing hearing. Any request for a name-clearing hearing must be asserted under § 1983, which necessitates that a person be sued. Because defendants are not "persons" under § 1983, Mazur cannot show an entitlement to a name-clearing hearing. The motion to compel will, therefore, be denied as moot in light of the court granting defendants summary judgment with respect to all Mazur's § 1983 claims for the reasons set forth in this opinion.

are agencies of the Commonwealth of Pennsylvania and the exceptions to Eleventh-Amendment immunity do not apply to any § 1983 claim asserted in this case. Id. at *3. Thus, defendants are immune from any private party suit under § 1983 for damages. See Bryant v. Cherna, 520 F. App'x 55, 57 (3d Cir. 2013) (citing MCI Telecomm. Corp. v. Bell Atl.–Pa., 271 F.3d 491, 503–04 (3d Cir. 2001)) (recognizing that "the Eleventh Amendment protects a state or state agency from a § 1983 suit, unless the state has waived its own immunity"); Perez v. Borough of Berwick, 507 F. App'x 186, 189 (3d Cir. 2012); Semian v. Dep't of Military & Veterans' Affairs - Gino J. Merli Veterans Ctr., No. 3:17-CV-1183, 2018 WL 4038116, at *6 (M.D. Pa. Aug. 23, 2018); Ayoub v. Com. Dep't of Pub. Welfare, No. CIV.A. 99-CV-6067, 2002 WL 31778801, at *1 (E.D. Pa. Dec. 12, 2002) (collecting decisions). Based upon the foregoing, defendants are entitled to judgment as a matter of law to the extent Mazur asserts a § 1983 claim based upon the deprivation of her constitutional rights.

## IV.    Conclusion

The court understands that Mazur seeks vindication against defendants for wrongfully accusing her of losing the $500.00. The claims asserted by Mazur in this case, however, do not provide a legal basis upon which she is entitled to relief. Mazur failed to adduce evidence upon which a reasonable jury could find: (1) with respect to counts one and two, that defendants imposed discipline upon her because she is white; (2) with respect to count three, that Lindsay harassed her because she is white; and (3) with respect to count four, that prior to August 10, 2016, she engaged in protected activity under Title VII, or that after August 10, 2016, she was harassed because she engaged in protected activity. The undisputed evidence of record shows that Mazur is not entitled to relief against defendants as a matter law with respect to her retaliation claim brought under § 1981. Mazur is not entitled to relief under § 1983 because defendants are not proper defendants

under that statute. For those reasons, Mazur's motion for summary judgment will be denied, Mazur's motion to compel a name-clearing hearing will be denied as moot, defendants' motion for summary judgment will be granted, and judgment will be entered in favor of defendants.

An appropriate order and judgment and will be entered.

BY THE COURT,

Dated: September 12, 2019 /s/ JOY FLOWERS CONTI
Joy Flowers Conti
Senior United States District Court Judge